# United States Court of Appeals for the Federal Circuit

---

**KELLOGG BROWN & ROOT SERVICES, INC.,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Cross Appellant.*

---

2012-5106, -5115

---

Appeal from the United States Court of Federal Claims in No. 09-CV-351, Judge Christine O.C. Miller.

---

Decided: September 5, 2013

---

JOHN P. ELWOOD, Vinson & Elkin, LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief were ERIC A. WHITE, TIRZAH S. LOLLAR and CRAIG D. MARGOLIS.

J. REID PROUTY, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-cross appellant. With him on the brief were STUART F. DELERY, Acting Assistant Attorney General, JEANNE E. DAVIDSON, Director, and ALEX P. HONTOS, Trial Attorney.

DANIEL P. GRAHAM, Wiley Rein LLP, of Washington, DC, for amici curiae. With him on the brief were NICOLE J. OWREN-WIEST and BRIAN G. WALSH.

———————————

Before NEWMAN, LOURIE, and WALLACH, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* WALLACH.

Opinion concurring-in-part, dissenting-in-part filed by *Circuit Judge* NEWMAN.

WALLACH, *Circuit Judge.*

Before the March 2003 invasion of Iraq, Kellogg Brown & Root Services, Inc. ("KBR") entered into multiple contracts with the United States Army for the provision of dining facility ("DFAC") services in Iraq. The contract at issue in this case was for DFAC services at Camp Anaconda ("Anaconda"), one of the largest United States military bases in Iraq at the time. In August 2003, KBR subcontracted with Tamimi Global Company, Ltd. ("Tamimi") to provide DFAC services in Anaconda. As troop levels increased, the Defense Contract Auditing Agency ("DCAA") engaged in audits of multiple DFAC subcontracts. With respect to Anaconda, the DCAA ultimately concluded that KBR had charged the Government $41.1 million in unreasonable costs for services provided from July 2004 to December 2004 and declined to pay that amount to KBR.

KBR sued in the United States Court of Federal Claims, alleging the Government unreasonably withheld the suspended $41.1 million. The Government brought multiple counterclaims, including a claim under the Anti-Kickback Act ("AKA"). The Court of Federal Claims held that KBR was entitled to $11,460,940.31 in reasonable costs. The court dismissed the majority of the Government's counterclaims, but awarded $38,000.00 to the Government on its AKA claim.

KBR appeals the Court of Federal Claims's calculation of reasonable costs, and the Government cross-appeals the court's decision with respect to its counterclaims.

Because the Court of Federal Claims did not clearly err in its calculations, we affirm its determination of cost reasonableness of the contract at issue. Additionally, we affirm the dismissal of the Government's Special Plea in Fraud and False Claims Act claims and the denial of the Government's common-law fraud claim. However, because the Court of Federal Claims improperly calculated KBR's base fee and erred when it determined that the actions of KBR's employees should not be imputed to KBR for purposes of the Government's AKA claim, those claims are reversed and remanded for further proceedings.

## BACKGROUND

### 1. LOGCAP III and Master Agreements

On December 14, 2001, the Army awarded the Army Logistics Civil Augmentation Program ("LOGCAP") Contract No. DAAA09-02-D-0007 ("LOGCAP III") to Brown & Root Services, which was then novated and transferred to KBR on August 1, 2003.[1] *Kellogg Brown & Root Servs. v. United States*, 103 Fed. Cl. 714, 716 (2012) ("*KBR II*"). This contract required KBR to implement logistics support services for the Army in Kuwait and Iraq before and during Operation Iraqi Freedom pursuant to

---

[1] Unless otherwise noted, the Background section is summarized from the findings of fact made by the Court of Federal Claims in *Kellogg Brown & Root Services v. United States*, 103 Fed. Cl. 714, 716–49 (Fed. Cl. 2012) ("*KBR II*"). For a thorough background of this case, *see KBR II*, 103 Fed. Cl. at 716–49; *Kellogg Brown & Root Servs. v. United States*, 99 Fed. Cl. 488, 490–94 (Fed. Cl. 2011) ("*KBR I*").

task orders issued under the contract. The compensation arrangement under LOGCAP III was a cost-plus-award-fee agreement that incorporated the provisions of Federal Acquisition Regulation ("FAR") § 52.216-7, whereby "the Army would reimburse KBR for all costs that it incurred in contract performance, including payments to subcontractors, along with a fee determined by subcontract costs." *Id.*

After the main contingent of ground troops began the invasion of Iraq from Kuwait on March 20, 2003, the Army began to focus on establishing dining facilities throughout Iraq, requiring KBR to establish the capacity to serve hot food to thousands of troops in a multitude of camps, well beyond that envisioned in the contract.[2]

The typical competitive bidding process KBR used to award subcontracts was burdensome and time-consuming in light of the Army's rapidly increasing demands. In June of 2003, KBR personnel began to create an alternative system of "master agreements." This allowed KBR to establish agreements with certain subcontractors before an Army directive was issued and abbreviate the procedural process of procuring subcontractors, thus enabling KBR to perform more quickly. The board deciding which subcontractors should receive master agreements had six members, including KBR's Regional Food Service Manag-

---

[2] The contract itself required KBR to be prepared for a "six-month deployment of a maximum of 50,000 troops at no more than eight camps." *KBR II*, 103 Fed. Cl. at 716. However, "KBR went from supporting tens of thousands [of troops], to supporting hundreds of thousands. Although initially KBR had approximately one month to establish over thirty DFACs in Iraq, eventually the Army was calling for more than fifty DFAC sites." *Id.* at 717–18 (internal quotation marks and citations omitted).

er for Iraq and Kuwait, Terry Hall, and his Deputy, Luther Holmes. One of the subcontractors KBR approached to enter into such a master agreement was Tamimi.[3]

### 2. History of Kickbacks

From April 2003 to January 2004, Mr. Hall and Mr. Holmes received multiple kickbacks from Tamimi's Vice President, Shabbir Khan. *KBR II*, 103 Fed. Cl. at 720–23, 776.

In April 2003, Mr. Khan agreed to finance a four-day trip that Mr. Hall took to Dubai, paying for the plane ticket and giving Mr. Hall $10,000.00, which Mr. Hall and Mr. Holmes split. Mr. Hall spent the first two days of his trip conducting business, and the second two days "hav[ing] fun." *Id.* at 721 (alteration in original). Mr. Hall took another trip in early-summer 2003 to Jordan, and Mr. Khan again paid for the ticket and gave Mr. Hall $3,000.00. Additionally, in either August or September of 2003, Mr. Khan gave Mr. Hall an ATM card "with a substantial amount of money on it." *Id.* at 722. Mr. Hall used some of the money for Christmas decorations for the dining facilities, but then spent approximately $3,500.00 on himself and handed over the card to Mr. Holmes.

Finally, Mr. Khan gave Mr. Hall $20,000.00 in cash in January 2004. Mr. Hall had been interested in the possibility of opening up a Golden Corral franchise after leaving the Army, and Mr. Khan's cash offer was for "exploratory" research on opening this franchise. *Id.* After spending approximately $7,000.00 on research for the franchise, Mr. Hall was unable to secure adequate

---

[3] As detailed by the Court of Federal Claims, KBR had previously employed Tamimi, and their relationship "was not always smooth." *KBR II*, 103 Fed. Cl. at 717.

financing and abandoned the project. He kept the re-
mainder of Mr. Khan's money for himself.

### 3.  Tamimi at Camp Anaconda

The master agreements KBR formed with subcontrac-
tors eventually corresponded to various regions of Iraq,
with different subcontractors servicing specific regions.
Not long after KBR instituted its master agreement
system, the Army issued a requirement for a DFAC in
Kirkuk, Iraq, a region associated with subcontractor The
Event Source ("TES"). However, the Government later
sent a letter directing KBR to relocate this DFAC to
Camp Anaconda. Although KBR initially planned to keep
TES as the subcontractor on this particular DFAC, it
ultimately awarded Master Agreement 3 Work Release 3
("WR 3") to Tamimi. Mr. Hall and Mr. Holmes had
strongly advocated choosing Tamimi over TES. *Id.* at 723.

"WR 3 provided that KBR would pay Tamimi a fixed
per person/per day ("PPPD") price based upon either
actual headcount of troops served at the Anaconda DFAC
or the projected headcount provided by the Army, which-
ever was greater." *Id.* at 724. However, because of a
confluence of factors, Tamimi began operating DFAC
services at Anaconda before KBR had internally approved
WR 3 or generated the necessary requisitions to pay
Tamimi for its services. *Id.*[4]

On September 4, 2003, the Army instructed KBR to
replace two of the Anaconda DFAC facilities with new,

---

[4]     A "requisition [is] a key instrument that provides
a general outline and description of work to be performed.
It provides the authorization, the signatures. It provides
[the Procurement personnel] an estimate, a rough order of
magnitude, price, cost." *KBR II*, 103 Fed. Cl. at 725 (in-
ternal quotation marks and citations omitted) (alteration
in original).

more permanent structures; however, KBR could not seek reimbursement from the Army under LOGCAP III for this work because it was in the business of providing services and not procuring buildings. A solution was devised where Tamimi would purchase the buildings and then indirectly charge KBR for the buildings through its DFAC subcontract. *Id.* at 725. As time elapsed, however, the Government determined that KBR should own the facilities. As the Court of Federal Claims noted, "[t]he negotiations between KBR and Tamimi regarding the construc-construction costs of these buildings played a significant role in the present dispute." *Id.*

Tamimi continued to operate the DFACs at Anaconda without the benefit of a contract and without the necessary requisitions by KBR. On November 3, 2003, however, KBR issued a material requisition, pricing six months of DFAC services for all four Anaconda DFACs at $111,650,000.00. After significant negotiations, extensions, and machinations, WR 3 was officially sanctioned within KBR on April 26, 2004.

### 4. Inquiry Into Tamimi's Prices

Despite this approval, Tamimi's prices submitted to KBR for DFAC services throughout Iraq were increasingly scrutinized; both the Army and the DCAA objected to the costs submitted. Under this scrutiny, in early- to mid-2004, KBR had begun providing brief extensions while recompeting many of its DFAC contracts.[5] "One group of

---

[5] "In some of those contracts, KBR was able to secure prices that were up to 40% lower than the original round of contracts." *KBR II*, 103 Fed. Cl. at 730. Recompeting a contract (or a subcontract) means reengaging in competitive bidding procedures, *see*, *e.g.*, FAR § 6.101, prior to or during contract performance, culminating in an award of the contract to one of the bidders. In this case, KBR, not the Army, was accepting and evaluating bids for

subcontracts that had been extended, yet was recognized to need renegotiation, was Tamimi's, including WR 3." *KBR II*, 103 Fed. Cl. at 730. DCAA had particular interest in Tamimi's subcontracts because Tamimi "was billing . . . based on either projected or actual headcount, whichever was higher." *Id.*

After discussions between KBR and Tamimi, the two negotiated modifications to WR 3, with Tamimi agreeing to a retrospective overall price reduction of $16,560,000.00 among Tamimi's nine subcontracts with $4,907,319.00 to be allocated to Anaconda.[6] On August 12, 2004, after those negotiations, KBR and Tamimi created Change Order 6 to WR 3. A number of changes were introduced including extending Tamimi's performance period through September 15, 2004, implementing the negotiated price reduction, incorporating a new contract pricing structure, and agreeing to further negotiations concerning the ownership of the new DFAC facilities.

Notwithstanding those efforts, KBR internally determined to not issue payments on Tamimi's invoices because of continued doubts as to the reasonableness of the prices agreed to by Tamimi.[7]

---

DFAC subcontracts through the use of competitive procedures.

[6] According to the Court of Federal Claims, the negotiations were acrimonious, with multiple failed attempts, Tamimi taking an "all or nothing" position, and KBR stopping all payments to Tamimi to induce and maintain negotiations. *KBR II*, 103 Fed. Cl. at 730.

[7] The record contains testimony and internal documentation from KBR that the procurement situation at Anaconda was, in the words of Mr. Petsche, "a mess." *KBR II*, 103 Fed. Cl. at 726.

### 5.  KBR's Failed Self-Performance

While negotiating the above modifications with Tamimi, KBR was also attempting to recompete the work at Anaconda.  After resisting, Tamimi eventually submitted a proposal for the Anaconda DFAC services on July 31, 2004; two other vendors were also planning to submit proposals.  However, while waiting for these proposals, "KBR was assessing whether it would be more beneficial—and less costly—simply to self-perform the DFAC work at Anaconda." *KBR II*, 103 Fed. Cl. at 734.  KBR management approved the idea because it predicted self-performance would result in savings of approximately $17 million.

KBR solicited proposals from vendors for the necessary labor pool to self-perform.  Difficulties quickly became apparent.  The necessary labor pool was not forthcoming, in part because "certain countries were precluding their citizens from entering Iraq." *Id.*  Because of extensive subcontractor logistical problems, unrelated to Tamimi, KBR was unable to begin self-performance and was forced to extend Tamimi's period of performance until November 30, 2004, and again for a long-term extension starting December 1, 2004.  The latter extension, however, was contingent on negotiations for "(1) a retroactive discount on prices from July through November 2004, and (2) a competitive price for the new period of performance." *Id.* at 735.[8]

---

[8]    Because of mounting tensions between KBR and Tamimi, KBR had begun "slow rolling payments" on Tamimi's invoices, which were computed using "the actual headcounts at the site and the average [PPPD] rate paid by KBR to its subcontractors," which was roughly half of the invoiced amount. *KBR II*, 103 Fed. Cl. at 734 (internal quotation marks and citation omitted) (alteration in original).

### 6. Change Order 9 Negotiations

These negotiations commenced on November 7, 2004, and included multiple items, in addition to the items listed above, and continued negotiations over the ownership of the new Anaconda DFAC facilities. Ms. Hayes, a Procurement Manager at Anaconda, was asked by KBR to attend and became the chief and sole negotiator in negotiations that spanned from approximately mid-December 2004 to the third week of January 2005. According to Mr. Jonas, KBR's former Vice President for Procurement Materials and Property, due to KBR's strategy of slow rolling payments, KBR owed Tamimi roughly $40,000,000.00. Ms. Hayes was unaware of this leverage and failed to use it in her negotiations.[9]

Based on the negotiations, Ms. Hayes and Tamimi agreed to Change Order 9 to WR 3. Change Order 9 officially extended Tamimi's period of performance at Anaconda until December 31, 2005. Tamimi agreed that ownership of the new DFAC facilities transferred to KBR as of November 30, 2004. Finally, Change Order 9 reflected discounts that Tamimi conceded under Change Order 6 (approximately $4,907,319.00) plus another $22,721,827.54 in discounts; therefore, the original WR 3 pricing had been reduced by a total of $27,629,146.50 from March 2004 through December 2004.

As per Change Order 9, Tamimi agreed to the following invoice amounts from March through December 2004:

| March 2004 | $17,062,621.37 | August 2004 | $11,839,168.60 |
|---|---|---|---|
| April 2004 | $17,070,364.23 | September 2004 | $11,722,522.57 |

---

[9] An extremely detailed account of these negotiations can be found in *KBR II*, 103 Fed. Cl. at 736–41.

| May 2004 | $11,604,646.78 | October 2004 | $11,843,324.53 |
|---|---|---|---|
| June 2004 | $11,613,139.81 | November 2004 | $11,682,396.16 |
| July 2004 | $11,806,568.98 | *December 2004* | *$6,085,825.43* |

*KBR II*, 103 Fed. Cl. at 741 n.9 (emphasis added). These numbers reflected the negotiated solution to the DFAC ownership dispute, with the amortization of the facilities spread over all of the months until November 30, 2004, when Tamimi agreed that ownership transferred to KBR. Additionally, the cost of food was included for the first two months when Tamimi was still providing food.

### 7. The "Boots-through-the-Door" Controversy

In October 2003, over a year before KBR and Tamimi began negotiations for Change Order 9, the DCAA began questioning the costs incurred at multiple DFAC facilities. At this time, the main controversy concerned a disagreement over whether the contracts were fixed-price and KBR would "be prepared to serve the number of troops that eventually were present at the location," or whether the contracts were variable-priced contracts based on the actual number of troops serviced ("boots-through-the-door controversy"). *KBR II*, 103 Fed. Cl. at 741.

In mid-2004 the Army formed the Special Cost Analysis Team ("SCAT") to perform "an in depth study of DFAC costs and issues." *Id.* at 742 (internal quotation marks and citation omitted). The leader of the SCAT effort was Lynn E. DeRoche, an official with the U.S. Army Tactical Command, who began working with KBR to resolve the boots-through-the-door issue. On March 31, 2005, KBR and the Government entered into the Global DFAC Settlement to resolve this controversy. "The Government offered KBR an overall decrement of $55 million on costs

invoiced under one of the task orders from September 2003 through February 2004, which KBR accepted." *KBR II*, 103 Fed. Cl. at 743. However, the site-specific reasonable amount for Camp Anaconda was calculated to be greater than the amount that KBR had invoiced in subcontract costs at the site. "Thus, none of the $55 million decrement was allocated to the subcontract agreement for DFAC services at Anaconda." *Id.*

The work of SCAT was ongoing. On July 8, 2005, Ms. DeRoche authored the Price Negotiation Memorandum, a summary of the negotiations between KBR and the Army and the Government's position on the Global DFAC Settlement. One paragraph of the summary dealt specifically with costs at a group of Tamimi-run dining facilities that included Anaconda during the March through June 2004 period included in Ms. Hayes's negotiations. The memorandum states:

> The reduced costs reflected for the credit memo period are the result of KBR's protracted negotiation with Tamimi, and are considered reasonable. When the associated credits are applied to the original invoices, the resulting costs are equivalent to KBR's new subcontract rate structure. The new Tamimi subcontract costs were viewed as reasonable . . . .

J.A. 5592.

Although KBR and the Army issued modifications implementing the Global DFAC Settlement, difficulties with Anaconda continued. On July 19, 2006, the DCAA "issued a preliminary findings report regarding DFAC services at Anaconda that questioned $44.8 million in KBR costs." *KBR II*, 103 Fed. Cl. at 744. Ultimately, DCAA determined $41.1 million to be unreasonable overcharges. After KBR submitted a claim to a contracting officer for the suspended $41.1 million, and while the contracting officer's decision was forthcoming, KBR

commenced suit in the Court of Federal Claims on June 2, 2009.

### 8.   Procedural History

KBR brought this suit pursuant to the Contract Disputes Act, 41 U.S.C. § 7101, *et seq.*, alleging that the Army had unreasonably withheld money from KBR when it challenged approximately $41 million in costs and markups associated with the Camp Anaconda dining facilities for July through December 2004.

As the case progressed, the Government brought counterclaims centered upon Mr. Hall and Mr. Holmes's acceptance of kickbacks from Mr. Khan.  The Government sought the forfeiture of KBR's claims pursuant to a Special Plea in Fraud, 28 U.S.C. § 2514, penalties under the AKA, 41 U.S.C. §§ 51–58,[10] damages and penalties under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733, and damages for common-law fraud.  On June 24, 2011, the court granted in part and denied in part KBR's motion to dismiss the counterclaims. *See Kellogg Brown & Root Servs., Inc. v. United States*, 99 Fed. Cl. 488, 516–17 (Fed. Cl. 2011) ("*KBR I*") (dismissing the Government's counterclaims under the Special Plea in Fraud and the FCA but refusing to dismiss the AKA and common-law fraud claims for rescission and disgorgement).

Following a ten-day bench trial, the Court of Federal Claims determined that $11,460,940.31 of the direct costs KBR sought were "reasonable" and thus reimbursable pursuant to FAR § 31.201-3.  Together with overhead costs and general and administrative expenses, the court awarded a total of $11,792,505.31 plus interest. *KBR II*, 103 Fed. Cl. at 780.

---

[10]   The AKA has been recodified at 41 U.S.C. §§ 8701–07.

This calculation was based on a rate of $6,085,825.43 per month. This monthly rate was the price negotiated by Ms. Hayes for the month of December 2004 and was "the first month that Ms. Hayes negotiated that did not, facially, include any facilities amortization." *Id.* at 770.[11] The Court of Federal Claims found that KBR "has justified as reasonable a monthly pass-through cost" of this amount. *Id.* at 771. The Court of Federal Claims then multiplied that monthly cost by the six months at issue ($36,514,952.58), subtracting the amount that had already been paid to KBR ($25,054.012.27), which brought the total still owed to KBR to $11,460,940.31.

The court also awarded the Government $38,000.00 on its AKA counterclaim, but denied the Government's common-law fraud claims. *Id.*

Both parties appealed. This court has jurisdiction pursuant to 28. U.S.C. § 1295(a)(3).

## DISCUSSION

This court reviews legal conclusions of the Court of Federal Claims without deference and its findings of fact for clear error. *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005). Contract interpretation is a question of law, which we review *de novo. Sevenson Envtl. Servs., Inc. v. Shaw Envtl., Inc.*, 477 F.3d 1361, 1364–65 (Fed. Cir. 2007).

---

[11] The Court of Federal Claims found that "[o]n this record," it could "not find that the facilities costs paid by Ms. Hayes were reasonable," and therefore chose to base its calculation without taking into account facilities amortization. *KBR II*, 103 Fed. Cl. at 770.

## I.   KBR'S APPEAL

KBR appeals the Court of Federal Claims's determination of reasonable fees and the calculation of KBR's base fee.  We address each argument in turn.

1.   The Court of Federal Claims Properly Evaluated Cost Reasonableness of the Subcontract Between KBR and Tamimi for July 2004 through December 2004.

Both parties agree that KBR is entitled to be reimbursed only for its "reasonable" costs under LOGCAP III.  They also agree that LOGCAP III incorporated, by reference, the cost principles in the FAR and that FAR § 31.201-3 (codified at Title 48 of the Code of Federal Regulations) governs the assessment of the reasonableness of KBR's costs.  That provision states that a cost is reasonable "if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business."  FAR § 31.201-3(a).  The regulation further provides that:

> (b) What is reasonable depends upon a variety of considerations and circumstances, including—
>
>      (1) Whether it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance;
>
>      (2) Generally accepted sound business practices, arm's length bargaining, and Federal and State laws and regulations;
>
>      (3) The contractor's responsibilities to the Government, other customers, the owners of the business, employees, and the public at large; and
>
>      (4) Any significant deviations from the contractor's established practices.

FAR § 31.201-3(b).

KBR admits that the language above "emphasizes its nonexclusivity, saying reasonableness 'depends upon a *variety* of considerations and circumstances, *including*' but not limited to those listed in the regulation." KBR Reply Br. 14 (emphasis in the original). Notwithstanding, KBR's core argument is that the Court of Federal Claims committed legal error by "appl[ying] an improper standard for reviewing the reasonableness of costs under the Contract Disputes Act . . . ." KBR Br. 29. According to KBR, "cost-reimbursement contracts require only that the contractor gives its 'best efforts' when performing, and its costs are payable absent gross misconduct" or "absent arbitrary action or a clear abuse of discretion." *Id.* at 32.

KBR's suggested standard of review finds no support in the text of section 31.201-3 or our precedent. Section 31.201-3 of the FAR affords the reviewing officer or court considerable flexibility in assessing the reasonableness of costs. The words "arbitrary," "gross negligence," and "willful misconduct" do not appear in the text. Our prior authority on cost reasonableness is contrary to KBR's position. In *Boeing North American, Inc. v. Roche*, this court reasoned that a cost could be "unreasonable" under section 31.201-3 when "the contractor overcharge[d] the government for the materials." 298 F.3d 1274, 1281 (Fed. Cir. 2002). Absent from the court's example was any suggestion that the "overcharge" must be based on gross negligence or arbitrary behavior. Although evidence of willful misconduct, gross negligence, or arbitrary conduct could well provide a basis for a contracting officer or court to disallow costs under the regulation, such evidence is not required. KBR offers many pages of non-binding law to illustrate the amount of discretion courts have afforded to contractors.[12] However, KBR offers no binding prece-

---

[12] KBR states: "The court's conclusion conflicts with the bedrock principle that the government bears *all* risk in cost-reimbursement contracting and a half-century of

dent in defense of their position that all risk in cost-reimbursement contracting falls on the Government and does not dispute that KBR is entitled to be reimbursed only for its "reasonable" costs under LOGCAP III.

Rather, the Court of Federal Claims applied the correct standard articulated by FAR § 31.201-3, and its analysis was consistent with the regulation's admonition that the reasonableness of specific costs "must be examined with particular care" when the costs incurred "may not be subject to effective competitive restraints." FAR § 31.201-3(a).

In addition to arguing that the Court of Federal Claims employed the wrong standard, KBR argues at length that the court improperly assessed specific evidence with regard to cost reasonableness by crediting the wrong information at trial and ignoring other pertinent information.

Cost reasonableness "is a question of fact." *Gen. Dynamics Corp. v. United States*, 410 F.2d 404, 409 (Ct. Cl. 1969). The court will overturn factual determinations only when they are clearly erroneous. *See Ind. Mich. Power Co.*, 422 F.3d at 1373. The standard for assessing reasonableness is flexible, allowing the Court of Federal Claims to consider many fact-intensive and context-specific factors. *See* FAR § 31.201-3. The Court of Federal Claims's two opinions total roughly 150 pages, and comprehensively articulate the court's assessment of the cost reasonableness of the Tamimi subcontract from July 2004

---

case law acknowledging contractors' considerable discretion and holding costs to be reasonable absent gross misconduct." KBR Reply Br. 8–9 (emphasis added).

to December 2004.  We address each of KBR's specific arguments in turn.[13]

## A.  The Court of Federal Claims's Analysis of KBR's Effort at Self-Performance Did Not Impermissibly Focus on Outcome Rather than "Best Efforts."

The Court of Federal Claims found that KBR's summer 2004 effort to end Tamimi's involvement by self-performing dining services was "disastrous."  *See KBR II*, 103 Fed. Cl. at 752, 758.  KBR argues that this was reversible error since the Court of Federal Claims supposedly focused on the outcome of KBR's decision to self-perform, not its reasonableness *ex ante*. KBR Br. 40.  KBR argues that this "error unquestionably infected the court's assessment of the reasonableness of *all* KBR's June-December 2004 prices." *Id.* at 43 (emphasis in original).

Contrary to KBR's characterization, the Court of Federal Claims did not conclude that KBR's costs were unreasonable based solely on KBR's failed self-performance.  Rather, it adopted KBR's urging at trial that reasonableness must be determined in context, not based on standards for "conference room" contracting. *KBR II*, 103 Fed. Cl. at 751.  The Court of Federal Claims agreed with KBR that "costs need to be reasonable, not in a vacuum, but in

---

[13]   KBR bore the initial burden to establish that its costs were reasonable. FAR § 31.201-3(a).  As noted by the Court of Federal Claims, "[p]reviously, a contractor's incurred costs were entitled to a presumption of reasonableness, and the Government bore the burden of proving that the costs were unreasonable"; however, this presumption was superseded in 1987 when FAR § 31.201-3 was amended. *KBR II*, 103 Fed. Cl. at 749–50 (citing 52 Fed. Reg. 19,800, 19,804 (May 27, 1987)); *Ace Constructors, Inc. v. United States*, 70 Fed. Cl. 253, 275 (2006); *George Sollitt Constr. Co. v. United States*, 64 Fed. Cl. 229, 245 (2005)).

the context of the events in which they arose." *Id.* But, it cautioned KBR that consideration of all of the circumstances cut both ways: "KBR cannot now point to a deficit in bargaining power and contend that its weakened state entitles it to greater latitude" because a "contractor may not itself manufacture—or in this case exacerbate—a situation that leads to higher costs for the Government . . . ." *Id.* at 752. Here, the Court of Federal Claims found that KBR was in a weak position with Tamimi, which stemmed from KBR's own conduct, including "fail[ure] to negotiate prices prospectively" and its "attempt to self-perform the work at Anaconda." *Id.* at 758.

These observations did not end the Court of Federal Claims's analysis. Even in its weakened position, KBR failed to act prudently to improve its leverage: "the court finds that the prudent business person would have seized any available advantage," which for KBR was $40 million in withheld funds that Ms. Hayes, KBR's negotiator, did not know about or use to KBR's advantage. *Id.* The subsidiary finding, that KBR's disastrous self-performance harmed its bargaining position with Tamimi, is not clearly erroneous, nor was it legal error to consider this fact in assessing cost reasonableness.

Additionally, even if there had been an infirmity in the Court of Federal Claims's discussion of self-performance, self-performance was only one of numerous findings supporting the Court of Federal Claims's reasonableness determination. *See* FAR § 31.201-3(b) (providing that reasonableness is determined based "upon a variety of considerations and circumstances"). Finally, KBR's self-performance argument attacks the Court of Federal Claims's weighing of the evidence, which this court will rarely disturb. *See Pacific Gas & Elec. Co. v. United States*, 668 F.3d 1346, 1353 (Fed. Cir. 2012) (weighing of evidence is "within the special province of the trial judge") (internal quotation marks and citation omitted).

B.   The Court of Federal Claims Did Not Impermissibly Second-Guess KBR's Arm's-Length Negotiations with Tamimi or Fail to Consider KBR's Collective Knowledge in Assessing Reasonableness.

Similar to its argument above, KBR also contends that the Court of Federal Claims impermissibly "second-guessed" KBR's negotiations with Tamimi. KBR Br. 43–48. KBR argues that the court failed to give the proper weight to this "arm's length bargaining" and how such bargaining supports a determination of reasonableness. *Id.* at 43 (citing FAR § 31.201-3(b)(2)). KBR argues that the Court of Federal Claims's assessment of these negotiations runs afoul of both the "business judgment rule" and the requirement that the court look to management collectively, not to the actions of individual employees. *Id.* at 44, 46–47.

KBR analogizes its requested standard, the "business judgment rule," to "its corporate-law analogue," which restricts courts from imposing liability "'in the absence of a showing of abuse of discretion, fraud, bad faith, or illegality.'" *Id.* at 36 (quoting *In re Bal Harbour Club, Inc.*, 316 F.3d 1192, 1195 (11th Cir. 2003)). Similarly, Amici Curiae the Professional Services Council and the National Defense Industrial Association argue that the Court of Federal Claims applied the wrong standard but do not urge the extreme standard argued by KBR. Amici Curiae offer instead that "what a contractor must prove, and what the [Court of Federal Claims] or [Board of Contract Appeals] must determine *de novo*, is whether *any* prudent businessperson in the contractor's position would have incurred the disputed cost." Amici Curiae Br. 8, 10 (emphases in original). As stated above, the Court of Federal Claims employed the correct standard to determine cost-reasonableness.

FAR § 31.201-3(a) requires the court to examine the reasonableness of a contractor's actions to ensure that

those actions result in costs that do not exceed "that which would be incurred by a prudent person in the conduct of competitive business." A trial court's review is not restricted to only "management" actions. If a contractor acts primarily through one employee, manager or not, that employee's actions may well be a focus of the reasonableness inquiry.[14]

KBR again appears to contest the trial court's weighing of the evidence and its assessment of KBR's witnesses. "[I]n reviewing factual findings under the clear error standard, this court 'gives great deference to the [trial] court's decisions regarding credibility of witnesses.'" *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1171 (Fed. Cir. 2006) (citing *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1378–79 (Fed. Cir. 2000)).

The Court of Federal Claims found the agreement arising from Change Order 9 was unreasonable, based in part on its determination that KBR's negotiator, Ms. Hayes, failed to leverage withheld funds, did not set goals for the negotiation, and could not justify the prices. Ms. Hayes's testimony did not convince the court otherwise. Rather, it found that "the enthusiastic endorsement of Ms. Hayes by Mr. Jonas and plaintiff's counsel was borne out by neither her testimony nor the record of her negotiations that she included in her Negotiation Memorandum dated March 29, 2005. Her testimony was in the nature of summations on the topics, flavored with anecdotes." *KBR II*, 103 Fed. Cl. at 736 (internal citation omitted). KBR argues the court improperly "gave no weight" to the fact that Change Order 9 arose from an arm's-length negotiation. *See* KBR Br. 43. The court's credibility determinations and extensive assessment of the Change Order 9 negotiations are not clearly erroneous.

---

[14] Ms. Hayes testified that she was a procurement manager. *KBR II*, 103 Fed. Cl. at 735.

C.  The Court of Federal Claims Did Not Clearly Err in
Evaluating the Army's Directives.

KBR contends that the Court of Federal Claims failed to consider the Army's directives in evaluating reasonableness. KBR Br. 48–51.  According to KBR, although the Court of Federal Claims "recognized that the Army had told KBR that it was *imperative* for troop morale that soldiers in the field have hot, freshly prepared meals," the Court of Federal Claims "refused to weigh the urgency of the action—and the risk of non-performance . . . —in evaluating the reasonableness of the prices negotiated . . . ." *Id.* at 48 (emphasis in original).

KBR correctly notes that the FAR instructs "'contractor's responsibilities to the Government'" to be considered in evaluating reasonableness. *Id.* at 48–49 (quoting FAR § 31.201-3(b)(3)).  The Court of Federal Claims repeatedly considered all the circumstances, including the Army's directives and the fact that the costs were incurred in a demanding war-time environment. *See KBR II*, 103 Fed. Cl. at 752 (noting "the Army placed great demands on KBR at the outset of the war" and "the urgent need to provide many services in many locations for the Army"); *id.* (noting that the Army "favored" Tamimi); *id.* at 751 (concurring that KBR "need[ed] to fulfill the demands of the Government in performing under LOGCAP III"); *id.* at 752–53 (noting costs were incurred from a war "initially conducted as a contingency operation . . . that became a sustained effort"); *id.* at 753 (recognizing that costs "were impacted by fluctuating projections for the number of troops on the ground"); *id.* (stating that costs "were driven by the singular goal of putting DFAC facilities in place to offer warm meals to the troops by July 4, 2003"); *id.* at 726–27 (acknowledging that the "constantly changing demands required by the Army's effort were foreseeable to neither the Army nor to KBR").

The Court of Federal Claims's consideration of that evidence and assessment of the Army's directives was not clearly erroneous.

### D.  The Court of Federal Claims Did Not Clearly Err in Not Awarding Any Sum for the Amortization of Facilities Cost nor Did It Impermissibly Equate Reasonable Costs with Lowest Costs.

KBR argues that the Court of Federal Claims incorrectly adopted the December 2004 pricing as the amount reasonably supportable, arguing that the Court of Federal Claims conflated reasonable cost with "lowest cost." KBR Br. 53–56. According to KBR, "there is no evidence whatsoever that Tamimi, or any other contractor, would have accepted that as a stand-alone figure—the lowest price ever obtained for Anaconda, cherry-picked out of a 22-month package deal, divorced from other terms favoring Tamimi." KBR Reply Br. 21 (emphasis removed).[15]

The Court of Federal Claims was within its discretion in finding that KBR failed to prove that its costs were reasonable. KBR declined to present independent evidence of the reasonableness of the facilities costs (or any other component of the challenged costs). *KBR II*, 103 Fed. Cl. at 752. The Court of Federal Claims was "confident" of the evidence that KBR had paid "most" of the expense of the facilities to Tamimi by July 2004 (*i.e.*, before the period of costs at issue in this lawsuit). *Id.* at 770. It seems that KBR seeks a presumption that it is entitled to reimbursement simply because it incurred

---

[15]  As stated by KBR: "the court took [the December 2004] price—at 55% below Change Order 6 pricing, the lowest price KBR ever achieved for that facility, and a far greater reduction than KBR had achieved in *any* other renegotiation or competition—and *applied it to the entire period services were provided*[.]" KBR Br. 55–56 (emphases in original) (citations omitted).

facilities costs.  It is not. *See* FAR § 31.201-3(a) (providing that it is the contractor's burden to prove the reasonableness of costs and that "[n]o presumption of reasonableness" exists).

Similarly, the Court of Federal Claims's decision to base its calculation on the negotiated December 2004 pricing is not clear error.  FAR § 31.201-3, which provides the standard for determining reasonableness, affords the Court of Federal Claims considerable discretion in determining whether a cost is reasonable and therefore allowable.  The Court of Federal Claims used Tamimi's July 2004 competitive bid proposal as a guide for its reasonableness analysis, even though it "was not the lowest of the bids to be received in response to the July 2004 solicitation." *KBR II*, 103 Fed. Cl. at 770.[16]  The Court of Federal Claims stated that "subsequent events would suggest that [Tamimi's July 2004 bid] was itself inflated." *Id.*  As discussed above, although it was KBR's burden to prove reasonableness, KBR chose not to provide independent analysis to show the reasonableness of its costs.  Having chosen to proceed by what the Court of Federal Claims characterized as "circumstantial" evidence (*e.g.*, the Hayes negotiations, the Global DFAC Settlement, and the DCAA audits), *see id.* at 752, and attempting to show reasonableness by focusing on Change Order 9's "discounts" from earlier prices, KBR has not now shown the Court of Federal Claims's weighing of the evidence or calculation of price was clearly erroneous.

E.  The Court of Federal Claims Did Not Err in Its Evaluation of the Price Negotiation Memorandum.

KBR argues that a one-paragraph "admission" in the Price Negotiation Memorandum should constitute compel-

---

[16]  As discussed above, KBR ultimately elected to self-perform the DFAC services instead of making an award based on the July 2004 solicitation.

ling evidence of the reasonableness of the prices at Camp Anaconda.[17]   The Court of Federal Claims rejected this argument, stating that KBR "attempt[ed] to place more weight on the one paragraph in Ms. DeRoche's [memo] than it can fairly bear." *KBR II*, 103 Fed. Cl. at 761.  The Court of Federal Claims went on to note that "[w]hile Ms. DeRoche was a highly credentialed government employee, the sheer scope [of the report at issue] colors any argument that price reasonableness at any one particular [dining facility] was considered." *Id.*  The court's decision to find the one paragraph concerning Camp Anaconda to be less persuasive than the information gleaned at the trial was not clearly erroneous.

## 2.   The Court of Federal Claims's Calculation of KBR's Base Fee Was Incorrect.

According to KBR, "[t]he court's erroneous fee calculation is a second independent basis for reversal." KBR Br. 59.  The Court of Federal Claims awarded KBR a base fee calculated as 1% of the total amount of direct costs it awarded as *reasonable* ($11,460,940.31), or $114,609.40.  *KBR II*, 103 Fed. Cl. at 780.  According to KBR, however, because the LOGCAP III contract called for a fixed-base

---

[17]   As noted in the Background section, on July 8, 2005, Ms. DeRoche authored the Price Negotiation Memorandum, which stated in part:

> The reduced costs reflected for the credit memo period are the result of KBR's protracted negotiation with Tamimi, and are considered reasonable. When the associated credits are applied to the original invoices, the resulting costs are equivalent to KBR's new subcontract rate structure. The new Tamimi subcontract costs were viewed as reasonable . . . .

J.A. 5592.

fee by which KBR would receive "1% of *all* fee-bearing costs," J.A. 5105 (emphasis added), that fixed base fee remains the same regardless of the costs KBR actually incurred, whether reasonable or not. KBR Br. 59.

It seems the Government agrees: "The base fee, as KBR correctly argues, is owed to it for negotiated estimated costs." Gov't. Br. 77 (citing KBR Br. 60). However, the Government argues, somewhat confusingly, that because there was "no evidence presented that KBR will not be paid the balance of the base fee that had been calculated based upon its estimated costs on contract close-out," this court has no basis "to make such an award at this appeal." Gov't. Br. 77–78.

KBR responds that "the government provides no reason KBR must wait until LOGCAP's conclusion to receive the fee it admits is rightly due for services performed nearly a decade ago, or why this Court must leave a flawed judgment intact." KBR Reply Br. 23.

The record shows that the base fee is to be calculated as follows:

> The fee for this contract is composed of a base fee of 1% of all fee-bearing costs. Fee bearing costs shall be established based on negotiated estimated costs to execute the effort.

J.A. 5105. The Court of Federal Claims incorrectly calculated the base fee to be awarded, and that determination is reversed and remanded with instructions to calculate the fee consistently with this opinion.

## II. THE GOVERNMENT'S CROSS-APPEAL

Turning to the Government's cross-appeal, the Government argues that the subcontract at issue was fraudulent from its inception and that the subcontract "could never have been awarded without the acquiescence of KBR's corrupted Food Services managers, who also inter-

vened on Tamimi's behalf when KBR's subcontract administrator decided to award the Camp Anaconda DFAC subcontract to one of Tamimi's competitors." Gov't. Br. 21. KBR responds that the Court of Federal Claims "correctly rejected the government's 'relentless efforts to shoehorn' this contract dispute into the rubric of fraud, seeking to recoup hundreds of millions of dollars for fully—and successfully—performed services based on 'taint' allegedly caused by $38,000.00 in kickbacks to two 'mid-level' employees." KBR Reply Br. 9 (quoting *KBR II*, 103 Fed. Cl. at 771).

The Government challenges the Court of Federal Claims's holdings regarding the following claims: Special Plea in Fraud, 28 U.S.C. § 2514; False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733; Anti-Kickback Act "(AKA"), 41 U.S.C. §§ 51–58; and common-law fraud. This court reviews the Court of Federal Claims's findings with respect to each statute individually, because liability under one statute does not automatically trigger liability under the others. *See Miller v. United States*, 550 F.2d 17, 22–23 (Ct. Cl. 1977) (negligence and ineptitude are not "practicing a fraud," but may establish liability under the False Claims Act); *Little v. United States*, 152 F. Supp. 84, 87–88 (Ct. Cl. 1957) (claimant practiced fraud and thus forfeited claim, but was not liable under the False Claims Act); *Young-Montenay Inc. v. United States*, No. 90–3862C, 1993 WL 721993, at *4 (Fed. Cl. Jan. 6, 1993), *aff'd*, 15 F.3d 1040 (Fed. Cir. 1994) (claimant was liable under the False Claims Act but not under the Contract Disputes Act's Anti-Fraud provision).

"This court . . . reviews de novo a dismissal for failure to state a claim pursuant to Rule 12(b)(6) of the Court of Federal Claims, just as it does dismissals under Federal Rule of Civil Procedure 12(b)(6)." *Laguna Hermosa Corp. v. United States*, 671 F.3d 1284, 1288 (Fed. Cir. 2012). "A complaint must be dismissed under Rule 12(b)(6) when the facts asserted do not give rise to a legal remedy or do

not elevate a claim for relief to the realm of plausibility." *Id.* (internal citations omitted). In deciding a motion to dismiss, the court must accept well-pleaded factual allegations as true and must draw all reasonable inferences in favor of the claimant. *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).

Following a trial, we review the factual findings of the Court of Federal Claims for clear error and its legal conclusions *de novo. Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1371 (Fed. Cir. 2004).

 1.  The Court of Federal Claims Correctly Dismissed the Government's Special Plea in Fraud, Brought Pursuant to 28 U.S.C. § 2514 ("the Forfeiture Statute").

The forfeiture statute provides that:

A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

28 U.S.C. § 2514. To prevail, the Government must prove its allegations by clear and convincing evidence. *UMC Elecs. Co. v. United States*, 249 F.3d 1337, 1338–39 (Fed. Cir. 2001).

This court has held that to prevail on a counterclaim alleging fraud under 28 U.S.C. § 2514, the challenger is required to "'establish by clear and convincing evidence that the contractor knew that its submitted claims were false, and that it intended to defraud the government by submitting those claims.'" *Daewoo Eng'g & Constr. Co. v. United States*, 557 F.3d 1332, 1341 (Fed. Cir. 2009) (quoting *Commercial Contractors v. United States*, 154 F.3d 1357, 1362 (Fed. Cir. 1998)); *accord Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1379 (Fed. Cir. 2001). "[F]orfeiture under 28 U.S.C. § 2514 requires only

part of the claim to be fraudulent." *Daewoo Eng'g*, 557 F.3d at 1341.

The Government argues that the Court of Federal Claims incorrectly held this statute inapplicable, stating that (as in the analogous FCA context), "any invoice submitted upon a *fraud-tainted contract* supports the finding of a 'false or fraudulent' claim." Gov't. Br. 27 (emphasis added). The Government urges a finding of fraud, supporting forfeiture, "when fraud in the contract performance undermined the legitimacy of the contract upon which the plaintiff sought compensation." *Id.* at 27–28.

This is an impermissibly broad reading of the law. The Court of Federal Claims correctly limited the statute:

> A valid cause of action under [the forfeiture statute] must be tied to the submission of a claim, whether in producing false proof to support a claim, *see, e.g.,* [*Kamen Soap Prods. Co. v. United States*, 124 F. Supp. 608, 622 (1954)] (forfeiting claim because falsified documentation was submitted in presentation of claim), or in falsely establishing the claim, *see, e.g.,* [*N.Y. Mkt. Gardeners' Ass'n v. United States*, 43 Ct. Cl. 114, 136 (1908)] (Government's objection to claim based on contractor's not fulfilling contract specifications, i.e., "establishment" of a false claim).

*KBR I*, 99 Fed. Cl. at 501. On its face, the statute is limited to those circumstances where the Government proves fraud "in the proof, statement, establishment or allowance" of a claim at the Court of Federal Claims, not in the execution of a contract.[18]

---

[18] Several other Court of Federal Claims decisions state otherwise: "The words of the statute make it apparent that a claim against the United States is to be forfeit-

Statutory context confirms this reading. *Alexander v. Sandoval*, 532 U.S. 275, 288 (2001) (beginning analysis of the statute at issue with the text and structure of the statute). The provision codified at section 2514 was part of legislation creating the Court of Federal Claims and regulating its operations and procedure. *See* Act of Mar. 3, 1863, ch. 92, 12 Stat. 765, 767. The surrounding provisions concern requirements for filing claims, including time limits and verification. Thus, the neighboring provisions illustrate that the forfeiture statute is best understood as a companion requirement of claims procedure rather than a catch-all anti-fraud provision. The legislation's sponsors confirmed the forfeiture statute addressed fraud by "any claimant against th[e] Government in the demand or establishment of his claim . . . ." Cong. Globe, 37th Cong., 2d Sess. 1674 (1862) (statement of Rep. Bingham). And this court's predecessor concluded the forfeiture statute addressed "frauds committed in the proof of claims before the newly empowered Court of Claims." *O'Brien Gear & Mach. Co. v. United States*, 591 F.2d 666, 678 (Ct. Cl. 1979).[19]

---

ed if fraud is *practiced* during the contract performance *or* in the making of the claim." *Crane Helicopter Servs., Inc. v. United States*, 456 Fed. Cl. 410, 431 (1991) (emphasis added); *see also Anderson v. United States*, 47 Fed. Cl. 438, 444 (2000); *Supermex, Inc. v. United States*, 35 Fed. Cl. 29, 39–40 (1996). This is an impermissibly broad reading of the statute.

[19]   This court has held that "[t]o prevail under [28 U.S.C. § 2514], the government is required to establish by clear and convincing evidence that the contractor knew that its submitted claims were false, and that it intended to defraud the government by submitting those claims." *Glendale Fed. Bank FSB v. United States*, 239 F.3d 1374, 1379 (Fed. Cir. 2001) (internal quotation marks and citation omitted) (alterations in original). The Govern-

The Court of Federal Claims correctly dismissed the Government's Special Plea in Fraud claim.

### 2.   The Court of Federal Claims Correctly Dismissed Counterclaims Brought Pursuant to the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733.

To state an FCA claim, the Government must show "(1) the contractor presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; (3) the contractor knew the claim was false or fraudulent; and (4) the United States suffered damages as a result . . . ." *Young-Montenay*, 15 F.3d at 1043.

The Government argues two reasons why the Court of Federal Claims incorrectly dismissed its FCA claims. The first is that the invoices for the Camp Anaconda dining services subcontract were false or fraudulent because the subcontract itself was tainted by kickbacks. However, the Government does not argue here and did not argue below that the invoices themselves were false or fraudulent, a showing that is required for a FCA claim to be successful. As correctly pointed out by the Court of Federal Claims, "[n]o presumption applies to the FCA that would relieve defendant of its burden to plead facts supporting the elements of an FCA claim." *KBR I*, 99 Fed. Cl. at 510. The Government must claim the threshold requirements

---

ment does not appear to plead the requisite "intent to defraud." Rather than alleging that KBR intended to defraud the Government in filing its claim in the Court of Federal Claims, the Government alleges that Hall and Holmes "knew or had reason to know" their kickbacks would lead to inflated contract prices. Defendant's Amended Answer and Counterclaims, J.A.150–51, ¶118. The Government thus alleges fraud in the execution of the contract, not fraud in the submission of a claim, as required by section 2514.

under the FCA, *i.e.*, that a false or fraudulent claim was submitted and that KBR knew of its falsity. *See Young-Montenay*, 15 F.3d at 1043.[20]

The Government also argues its allegations are sufficient because the invoices at issue should be presumed to be inflated by at least the amount of the kickback, if not more. Gov't. Br. 39. The Government states that "[t]here is no principled reason why the common-law presumption of price inflation should not apply to the facts alleged here." *Id.* at 41. Again, however, the Government offers no reason why in this particular case, the Government should be discharged from alleging the threshold requirements of an FCA claim. As the Court of Federal Claims held: "Defendant must allege facts showing that the costs actually inflated the contract price." *KBR I*, 99 Fed. Cl. at 513.[21] None of the cases cited by the Govern-

---

[20]    While there is a line of cases attaching FCA liability for false statements that induced the Government to award a contract, *see Harrison v. Westinghouse Savannah River*, 176 F.3d 776, 787–88 (4th Cir. 1999), the Government does not seem to allege "fraud in the inducement" here, *see* KBR Reply Br. 43 n.21; *but see* Gov't. Reply Br. 14 n.7 (disagreeing that the Government had "disclaimed reliance on a line of case law about 'fraud in the inducement'"). Even if the Government had alleged fraud in the inducement, as the Court of Federal Claims stated, "[t]hese cases do not support the proposition that an FCA claim can be based on taint from a kickback alone." *KBR I*, 99 Fed. Cl. at 513.

[21]    This would be difficult to accomplish because of the Government's attenuated allegations that $38,000.00 in kickback payments made in 2003 resulted in inflated invoices for approximately $468 million worth of services performed into 2005. *See* KBR Reply Br. 46.

ment indicate that the Government can forgo compliance with ordinary rules of pleading and proof.[22]

3.   The Court of Federal Claims Erred When It Determined that the Actions of KBR's Head of Food Services for Iraq and Kuwait and His Deputy Should Not Be Imputed to KBR, for Purposes of Liability Under the Anti-Kickback Act ("AKA"), 41 U.S.C. §§ 51–58.

The AKA sets forth two separate civil remedies as follows:

(1) The United States may, in a civil action, recover a civil penalty from any person who *knowingly* engages in conduct prohibited by section 53 of this title. The amount of such civil penalty shall be—

(A) twice the amount of each kickback involved in the violation; and

(B) not more than $10,000 for each occurrence of prohibited conduct.

(2) The United States may, in a civil action, recover a civil penalty from any person whose employee, subcontractor or subcontractor employee violates section 53 of this title by providing, accepting, or charging a kickback. The amount of such civil penalty shall be the amount of that kickback.

41 U.S.C. § 55(a) (emphasis added).  Under this statutory scheme, a "kickback" is defined, in relevant part, as

---

[22]   Additionally, the Court of Federal Claims found that "even if KBR's reimbursement vouchers were inflated by the amount of the kickbacks, defendant has not alleged facts tending to show that anyone at KBR, including Messrs. Hall and Holmes, knew of that inflation." *KBR I*, 99 Fed. Cl. at 513.  Accordingly, the Government failed to allege the requisite knowledge for a FCA claim.

> any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to any prime contractor, prime contractor employee . . . for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contractor or . . . a subcontract relating to a prime contract.

*Id.* § 52(2).

The Court of Federal Claims, in interpreting the AKA, found that a corporation can be held vicariously liable under both § 55(a)(1) and § 55(a)(2). However, it found that the KBR officials who accepted kickbacks were not sufficiently senior to warrant a finding of vicarious liability in this case. Accordingly, the court held KBR liable only for the amount of the kickback under § 55(a)(2). We address each holding in turn.

Our analysis begins with the language of the statute. *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552, 554 (Fed. Cir. 1994) (citing *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988)). It is a well-settled principle of statutory interpretation that a "statute is to be construed in a way which gives meaning and effect to all of its parts." *Saunders v. Sec'y of Health & Human Servs.*, 25 F.3d 1031, 1035 (Fed. Cir. 1994) (citing *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 36 (1992) (noting the "settled rule that a statute must, if possible, be construed in such fashion that every word has some operative effect")).

The Court of Federal Claims correctly determined that § 55(a) of the AKA contemplates vicarious liability in both civil penalty provisions under subsections 1 and 2. Section 55(a)(1) directs that a civil penalty may be recovered from any "person," which is defined to include individuals, corporations, and other business associations. *See* 41 U.S.C. § 52(3). Section 55(a)(1) necessarily includes

the definition of "person" and, in doing so, establishes liability for a "corporation." *See* 41 U.S.C. § 52(3). To hold otherwise would strip the term "person" of its plainly intended definition.

The difference between § 55(a)(1) and § 55(a)(2) is the degree of knowledge that must be proven. The former provision—which carries a higher penalty—applies if the person knowingly engages in prohibited conduct. The latter provides for strict liability against a "person" who engages in prohibited conduct.

KBR argues that this reading would render Congress's reference to acts committed by an "employee, subcontractor, or subcontractor employee," which appears only in § 55(a)(2), superfluous. Indeed, there is tension between the definition of "person" in both sections and the presence of "employee, subcontractor, or subcontractor employee" in only § 55(a)(2). The legislative history, however, clarifies the point:

> Section [55(a)(1)] is meant to permit a civil recovery against anyone who knowingly engages in kickback activities . . . . It is intended to subject not only subcontractors and kickback recipients to civil liability, but also prime contractors, independent sales representatives and others who knowingly participate in kickback activities. It is also intended to reach companies whose employees engage in kickbacks, under the doctrine of respondeat superior.

132 Cong. Rec. S16,311 (daily ed. Oct. 15, 1986) (statement of Sen. Carl Levin). The distinction between the two different provisions rests on the degree of knowledge that must be proven, not the types of persons to whom the provisions apply.

After correctly determining that both sections contemplate vicarious liability, the Court of Federal Claims

then found that this case was not an appropriate case for finding vicarious liability: "Section 55(a)(2) anticipates circumstances where a prime contractor's employees are accepting kickbacks for which the prime contractor should be held responsible, yet they are doing so without corporate knowledge of their activities or they occupy positions of diminished or low authority, such that an imputation of knowledge to the prime contractor would be inappropriate." *KBR II*, 103 Fed. Cl. at 774. The Court of Federal Claims also stated that "[a]lthough facts in this case approach the dividing line, the court rules that strict liability under § 55(a)(2) is the appropriate and sole remedy in this case." *Id.*

The Government on appeal seeks to hold KBR liable under § 55(a)(1) of the AKA for the kickbacks accepted by KBR's employees, Hall and Holmes.[23] The Government argues that the Court of Federal Claims erred by not applying the correct principle of *respondeat superior*, and instead "making the qualitative determination, without articulating any test, that the two were insufficiently high in the corporate hierarchy for their actions and knowledge to be imputed to KBR." Gov't. Br. 43. The Government argues that the Court of Federal Claims erred "by focusing on the position KBR's employees occupied within KBR's corporate hierarchy, rather than on simply whether they were KBR's agents and whether they were acting within the scope of their employment." Gov't. Reply Br. 21.

Corporations act through their employees; the general rule is that an agent's knowledge is imputed to the prin-

---

[23] The Court of Federal Claims awarded the Government $38,000.00 for KBR's violation of the AKA under subsection 2, the actual amount of the payments the Court of Federal Claims found to have been taken by KBR's employees.

cipal when employees are acting with the scope of their authority or employment, absent special circumstances. *See Meyer v. Holley*, 537 U.S. 280, 285 (2003); *Long Island Sav. Bank, FSB v. United States*, 503 F.3d 1234, 1250 (Fed. Cir. 2007) (explaining the general rule of imputation of a culpable state of mind in the context of common-law fraud). Congress is presumed to "inten[d] its legislation to incorporate" traditional rules such as these. *Meyer*, 537 U.S. at 828.

In *Long Island Savings Bank*, this court recognized a narrow exception—the adverse-interest exception—to the general rule that a principal is liable for the acts of his agent: when the agent's conduct is "entirely" in the agent's interest without even incidental benefit to the principal. *See* 503 F.3d at 1249–50. There, the agent used his position to hire a law firm in which he had a secret interest to perform legal services for his principal, a bank. *Id.* at 1239. This court found that, because the bank received services through the transaction (albeit, a tainted transaction), the adverse-interest exception did not apply. *Id.* at 1250. Here, as in *Long Island Savings Bank*, whatever motivation Hall and Holmes had to accept kickbacks from Tamimi, KBR received a benefit. As the trial court put it: "KBR in fact benefitted by Messrs. Hall and Holmes's selection of Tamimi in that Tamimi did provide necessary services to KBR—operating DFACs." [24]

---

[24] Although the dissent agrees that *respondeat superior* applies under § 55(a)(1), it states that Hall and Holmes's knowledge should not be imputed to KBR because they acted adversely to KBR by taking the kickbacks, and thus did not "benefit" KBR. Dissenting Op. at 3. However, the dissent's agreement that *respondeat superior* applies to § 55(a)(1) necessarily means an employer (who does not know of kickbacks) can be liable for an employee's knowing acceptance of kickbacks. *See Long Island Sav. Bank*, 503 F.3d at 1249–50 (holding the

*KBR I*, 99 Fed. Cl. at 506 (internal quotation marks and citation omitted).

KBR argues that a different set of rules apply here because the AKA imposes punitive liability: "'The common law has long recognized that agency principles limit vicarious liability for punitive awards.'" KBR Reply Br. 55 (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 541 (1999)).

KBR argues that *Kolstad* stands for the proposition that vicarious liability may give rise to liability under section 55(a)(1) only when the agent serves in a "managerial capacity." *Kolstad* involved punitive damages under Title VII for instances of intentional discrimination. It was not an AKA case, and its rule should not be extended to the AKA context for a number of reasons, not the least of which is that a "punitive" damage award is distinct from the type of damages provided by the AKA. *Kolstad* grounded its holding in the Restatement (Second) of Agency § 217 C (1957), explaining that the Restatement limits when "an agent's misconduct may be imputed to the principal for purposes of awarding punitive damages." 527 U.S. at 542. However, these limits do not apply to "the interpretation of special statutes" like those giving "triple damages." Restatement (Second) of Agency § 217 C, cmt. (c) (1957). The "special statute" here, the AKA, with its double damage provision, does not involve punitive damages as that term was used in the statute at issue in *Kolstad*; the AKA is outside of the scope of *Kolstad* and the Restatement's heightened standard for vicarious liability.

---

agent's knowledge was imputed to the principal in spite of the Court of Federal Claims's finding that the agent had "abandoned his principal's interest" and was "acting to defraud his principal").

Accordingly, the Court of Federal Claims's determination that Hall and Holmes's knowledge should not be imputed to KBR is reversed and remanded with instructions to calculate damages consistent with the holding that KBR is liable for AKA violations under section 55(a)(1).[25]

4. The Court of Federal Claims Correctly Held KBR Was Not Liable for Common-Law Fraud.

This court stated in *Godley v. United States*, 5 F.3d 1473, 1476 (Fed. Cir. 1993):

> . . . the general rule is that a Government contract tainted by fraud or wrongdoing is void *ab initio* . . . . A contract without the taint of fraud or wrongdoing, however, does not fall within this rule. Illegal acts by a Government contracting agent do not alone taint a contract and invoke the void *ab initio* rule. Rather, the record must show some causal link between the illegality and the contract

---

[25] *See also United States v. Kellogg Brown & Root Services, Inc.*, No. 12-40447, 2013 WL 3779225 (5th Cir. July 19, 2013) (holding that a corporation can be held vicariously liable under section 55(a)(1) of the AKA and remanding the case to the district court to determine whether KBR officials acted under apparent authority in accepting kickbacks for the purposes of a knowing violation of the AKA). Holding KBR vicariously liable for Hall and Holmes's conduct and state of mind requires the subsidiary finding that Hall and Holmes were acting within the scope of their employment, a question of fact. No remand is required in this case, however, because the trial court already found that Hall and Holmes were acting "as KBR employees and operating under LOGCAP III" when they accepted the kickbacks. *KBR II*, 103 Fed. Cl. at 772. This finding was not clearly erroneous.

provisions. Determining whether illegality taints a contract involves questions of fact.

It therefore fell to the Government to prove the causal link between the kickbacks and the contract provisions. The trial court's finding that no such causational link existed is reviewed for clear error. *Ind. Mich. Power Co.*, 422 F.3d at 1373.

Following trial, the Court of Federal Claims found that KBR would have awarded the Anaconda subcontract to Tamimi even "absent any participation by Messrs. Hall and Holmes." *KBR II*, 103 Fed. Cl. at 779. The Government argues that this "but-for test, rather than a causal connection test," was incorrect and that the Court of Federal Claims found ample facts to support an overall finding of common-law fraud, such as "the factual finding that KBR employees receiving kickbacks played significant roles in the award of the Tamimi subcontract, including intervening with other KBR employees to ensure that Tamimi received the Camp Anaconda DFAC contract, rather than another contractor, as first intended." Gov't. Br. 3, 46.

The Court of Federal Claims found those facts. However, the Government does not dispute the Court of Federal Claims's overall finding that notwithstanding the kickbacks at issue, the subcontracts would still have been awarded to Tamimi. This court's precedent confirms that common-law fraud is not established simply by showing that kickbacks were paid to personnel involved in contract decision making: "Illegal acts by a Government contracting agent do not alone taint a contract . . . . Rather, the record must show some causal link between the illegality and the contract provisions." *Godley*, 5 F.3d at 1476.

*Godley*, on which the Government relies, Gov't. Br. 55–57, demonstrates that fraud must be a but-for cause of the outcome to satisfy the requirements of common-law fraud. There, a property owner contracted to build a post

office to lease to the U.S. Postal Service. When the Government later learned a subcontractor on the project had bribed the decision maker, it sought to void the contract. Because the case was before this court on summary judgment, it was remanded since the court could not "determine whether [the] illegal conduct *caused* any unfavorable contract terms," equating that inquiry with "determin[ing] whether [the] illegal conduct tainted the contract." 5 F.3d at 1476 (emphasis added); *accord id.* at 1475 n.1 (quoting *K&R Eng'g Co. v. United States*, 616 F.2d 469 (Ct. Cl. 1980) (stating that contracts are "tainted by illegality" when they are "'*the product of a conflict of interest*'") (emphasis in original)).

The Court of Federal Claims found facts both against and supporting a finding of common-law fraud. For example, with regard to WR 3, the Court of Federal Claims found that Hall and Holmes were responsible for WR 3's price estimate and statement of work, and they overrode the initial decision of KBR's procurement authorities to award the work release to a different contractor.[26] However, the Court of Federal Claims also found

---

[26]   As discussed in the Background section, the Court of Federal Claims stated:

Initially, Mr. Petsche considered simply relocating the TES team that had already been mobilized for the work at Kirkuk to Camp Anaconda. Although the evidence ultimately showed that the decision to use Tamimi was sound and practically justified, the court found Mr. Petsche's testimony credible that this idea [of using TES] was met with strong resistance by Messrs. Hall and Holmes in Food Service, both of whom advocated retaining Tamimi at Camp Anaconda. Eventually, Mr. Petsche relented, and on July 20, 2003, he authored a justification memorandum supporting Tamimi's retention as the vendor at Camp Anaconda.

that "ample evidence supports a finding that Tamimi would have received the award of the work at Anaconda regardless of Mr. Hall's actions," crediting the testimony of Mr. Jonas, KBR's former Vice President for Procurement Materials and Property, who testified that the award of WR 3 to Tamimi "just made sense" and that it "would have been irresponsible on the part of KBR at that time" to attempt to use another subcontractor at Anaconda. *KBR II*, 103 Fed. Cl. at 779 (internal quotation marks and citation omitted). Additionally, the Court of Federal Claims found that "[t]he notion of awarding the work at all four DFACs at Anaconda did not originate with Mr. Hall, but with Mr. [Jim] Spore," then-Regional Project Manager for Northern Iraq. *Id.*

Unlike *Godley*, this case is not before us on summary judgment, and the Court of Federal Claims did determine, as a finding of fact, that the illegal conduct overall did not irreparably taint the contract, *i.e.*, that "Tamimi would have received a Master Agreement and WR 3 absent any participation by Messrs. Hall and Holmes." *Id.* We discern no clear error in this determination.

CONCLUSION

Because the Court of Federal Claims did not clearly err in its calculations, we affirm its determination of reasonableness of costs. We also affirm the dismissal of the Government's Special Plea in Fraud and False Claims Act claims and the denial of the Government's common law-fraud claim. However, because the Court of Federal Claims improperly calculated KBR's base fee and erred when it determined that the actions of KBR's employees should not be imputed to KBR, for purposes of the Government's AKA claims, those claims are reversed and remanded for further proceedings.

---

*KBR II*, 103 Fed. Cl. at 723–24.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**

# United States Court of Appeals
# for the Federal Circuit

---

**KELLOGG BROWN & ROOT SERVICES, INC.,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Cross Appellant.*

---

2012-5106, -5115

---

Appeal from the United States Court of Federal Claims in No. 09-CV-351, Judge Christine O.C. Miller.

---

NEWMAN, *Circuit Judge*, concurring in part, dissenting in part.

Although the decision of the Court of Federal Claims is subject to controversy, for KBR provided substantial evidence that its arrangements with subcontractors to feed and accommodate a wartime Army were reasonable in view of the "constantly changing demands" of the Army's activities in the Iraq war, the Court of Federal Claims made a full and careful analysis.[1] The trial court acknowledged the "fluctuating projections" and "unforeseeability" of the needs and facilities demanded of KBR,

---

[1] *Kellogg Brown & Root Servs., Inc. v. United States*, 103 Fed. Cl. 714, 773 (Fed. Cl. 2012).

and there was no suggestion that KBR profited unduly from the erratic demands of the escalating war in Iraq. I concur in the conclusion that the trial court's analysis is supportable.

However, unlike the panel majority, I would also affirm the trial court's ruling that the actions of KBR's employees Hall and Holmes who accepted favors totaling $38,000 from a sub-contractor should not invoke the double penalty provision against KBR. There was no evidence that KBR "received a benefit" from these bribes to its employees, as the majority holds, maj. op. at 37, or had knowledge of the kickbacks at the time. Thus although I affirm the judgment of the Court of Federal Claims that KBR is strictly liable to pay the government this sum under 41 U.S.C. §55(a)(2), I would not impose the doubled penalty under §55(a)(1). To this extent, I respectfully dissent.

## DISCUSSION

As defined in the Anti-Kickback Act (AKA):

> The term "kickback" means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind that is provided to a prime contractor, prime contractor employee, subcontractor, or subcontractor employee to improperly obtain or reward favorable treatment in connection with a prime contract or a subcontract relating to a prime contract.

41 U.S.C. §52(2).[2] The AKA provides for two levels of liability of employers whose employees accept bribes or favors of any kind. Under 41 U.S.C. §55(a)(2), the employer is strictly liable to the United States for the specific value of any kickback received by an employee. Under

---

[2]    Congress re-codified the AKA without substantive change, placing it at 41 U.S.C. §§8701–07.

§55(a)(1), the employer is subject to an additional "civil penalty," for a total liability of twice the amount of each kickback, and a cap of $10,000 (now $11,000) per kickback event, if the employer had knowledge of the kickback.

Both liability levels arise under the "doctrine of respondeat superior," 132 Cong. Rec. S16, 311 (daily ed. Oct. 15, 1986) (statement of Sen. Carl Levin), whereby under general principles of agency law, principals are charged with liability of their agents' malfeasance "except where the agent is acting adversely to the principal." Restatement (Second) of Agency §275 (1958). However, a "principal is not affected by the knowledge of an agent in a transaction in which the agent secretly is acting adversely to the principal and entirely for his own or another's purposes." Restatement (Second) of Agency §282 (1958).

According to the majority's ruling, KBR as employer is charged with imputed knowledge of the kickbacks, and thus of liability for the double civil penalty, although it appears undisputed that KBR did not have actual knowledge. The majority states that KBR "received a benefit" from the kickbacks because Tamimi performed DFAC services under its existing contractual obligations. Maj. op. 37. This ruling erases the distinction between the two statutory levels of liability in the AKA. An existing contractual relationship is a *prerequisite* for liability under the AKA definition of "kickback." *See* 41 U.S.C. §52(2), *supra,* (defining kickback as payments etc. "in connection with a prime contract or a subcontract"); *see also* Black's Law Dictionary (9th ed. 2009) (a "kickback" is "A *return* of a portion of a monetary sum received . . . ." (emphasis added)). The majority's reasoning fails to recognize this inconsistency.

KBR acquiesced in its statutory strict liability under §55(a)(2), for the $38,000 that the subcontractor paid to KBR employees Hall and Holmes. KBR Reply Br. 6. The

Court of Federal Claims held KBR not liable under §55(a)(1) for the doubled penalty because KBR's management had no knowledge of these illicit payments and KBR did not benefit from them; this is the ruling that the panel majority reverses.

There was no evidence that the bribes paid to Hall and Holmes were known to KBR or were of benefit to KBR. Hall and Holmes kept the entire payments for themselves, as "party money" and for sham business ventures. 103 Fed. Cl. at 721–22, 773–74. Although the government suggests that the bribe-paying subcontractor may have procured its sub-contracts at inflated prices, this did not benefit KBR. No benefit to KBR has been shown.

My colleagues have removed the distinction between the two subsections of §55(a), by imposing the double penalty provision of §55(a)(1) in circumstances that invoke only the single strict liability provision of §55(a)(2). The trial court's ultimate and subsidiary factual findings on this issue are not clearly erroneous, and the Court of Federal Claims correctly limited KBR's liability to §55(a)(1). From my colleagues' reversal of the Court of Federal Claims' ruling on this issue, I respectfully dissent.