# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- ) | |
| ) | |
| Pro-Built Construction Firm ) | ASBCA No. 59278 |
| ) | |
| Under Contract No. W5J9JE-10-D-0016 ) | |

APPEARANCE FOR THE APPELLANT:      William J. Spriggs, Esq.
                                                          Spriggs Consulting Services
                                                          Lynchburg, VA

APPEARANCES FOR THE GOVERNMENT:      Thomas H. Gourlay, Jr., Esq.
                                                                   Engineer Chief Trial Attorney
                                                                 Pietro O. Mistretta, Esq.
                                                                 Matthew S. Tilghman, Esq.
                                                                 Michael A. Rea, Esq.
                                                                   Engineer Trial Attorneys
                                                                   U.S. Army Engineer District, Middle East
                                                                   Winchester, VA

## OPINION BY ADMINISTRATIVE JUDGE D'ALESSANDRIS

In July 2011, the United States Army Corps of Engineers (Corps) awarded Contract No. W5J9JE-10-D-0016 to appellant, Pro-Built Construction Firm (Pro-Built) for construction of a police station in Atghar District, Zabul Province, Afghanistan. The Corps did not issue a notice to proceed before terminating the contract for the convenience of the government in March 2012. In March 2012 Pro-Built first submitted a termination for convenience settlement proposal. In March 2014, following several revisions, and a Defense Contract Audit Agency (DCAA) audit, Pro-Built submitted a certified claim of roughly $1.1 million. In a final decision dated 4 April 2014, the Corps' contracting officer issued a unilateral determination that Pro-Built was entitled to $48,972. Pro-Built timely appealed that final decision to this Board. We sustain the appeal in part.

## FINDINGS OF FACT

### I.    *The Contract*

1. The U.S. Army Corps of Engineers Afghanistan District North issued a Multiple Award Task Order Contract (MATOC) No. W5J9JE-10-D-0016 to Pro-Built on 18 March 2010 (R4, tab 3). On 31 July 2011 the Corps awarded Task Order

No. 0009 (the contract or task order 9) in the amount of $4,976,022.32 to Pro-Built (R4, tab 16). Pro-Built performed other task orders pursuant to the MATOC in other parts of Afghanistan (tr. 1/44, 60).

2. Task order 9 was a firm-fixed-price contract for the design and construction of an Afghanistan National Police Uniformed Police District Headquarters Compound in Atghar District, Zabul Province (R4, tabs 16-17). The contract required site adaption and construction including an administration building, a well house, guard shacks, guard towers, barracks buildings, women's barracks, a Criminal Investigative Directorate/Family Response Unit building, a water tower and tank, a fuel storage facility, a vehicle refuel point, septic tank, perimeter security wall, and primary and secondary entry control points (R4, tab 1 at 5, tab 13 at 65). The contract required approval of a security plan before the contractor could start work on the project site, and submission of a quality control plan not later than five days after the notice to proceed (R4, tab 13 at 131, 219).

3. The contract had a performance period of 365 days from receipt of the notice to proceed (R4, tab 17 at 14). Although the Corps informed Pro-Built that it planned to issue the notice to proceed at the Pre-construction Conference (R4, tab 16 at 1), the notice was never issued (R4, tab 1 at 5).

4. Relevant to this appeal, the contract contained Federal Acquisition Regulation (FAR) 52.211-10, COMMENCEMENT, PROSECUTION, AND COMPLETION OF WORK (APR 1984) (R4, tab 17 at 14).

5. The contract also contained FAR 52.249-2, TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE) (MAY 2004) which provides that:

> (g) If the Contractor and the Contracting Officer fail to agree on the whole amount to be paid because of the termination of work, the Contracting Officer shall pay the Contractor the amounts determined by the Contracting Officer as follows...:
>
> ....
>
> (2) The total of –
>
> (i) The costs incurred in the performance of the work terminated, including initial costs and preparatory expense allocable thereto, but excluding any costs attributable to

2

supplies or services paid or to be paid under subparagraph (f)(1) of this clause;

(ii) The cost of settling and paying termination settlement proposals under terminated subcontracts that are properly chargeable to the terminated portion of the contract if not included in subdivision (g)(2)(i) of this clause; and

(iii) A sum, as profit on subdivision (g)(2)(i) of this clause, determined by the Contracting Officer under 49.202 of the Federal Acquisition Regulation, in effect on the date of this contract, to be fair and reasonable; however, if it appears that the Contractor would have sustained a loss on the entire contract had it been completed, the Contracting Officer shall allow no profit under this subdivision (iii) and shall reduce the settlement to reflect the indicated rate of loss.

(R4, tab 3 at 53-55)

6. The contract provided for liquidated damages of $1,579.00 from Pro-Built per calendar day of delay of completion of the contract beyond the 365-day performance period (R4, tab 17 at 14).

7. The contract also included a provision entitled "Sequence of Design-Construction (Fast-Track)" providing:

> After receipt of the Contract Notice to Proceed (NTP) the Contractor shall initiate design, comply with all design submission requirements and obtain Government review of each submission. The contractor may begin construction on portions of the work for which the Government has reviewed the final design submission and has determined satisfactory for purposes of beginning construction. The Contracting Officer will notify the Contractor when the design is cleared for construction.

(R4, tab 13 at 197)

8. The contract scope of work provided in ¶ 3.1.1 "Design Concept Coordination Meeting" that, shortly after the notice to proceed, the government or contractor could suggest a meeting to review the design submittal process (R4, tab 13

3

at 189). The scope of work described the design submittal process, including ¶ 3.8.2 "Sequence of Design-Construction (Fast-Track)" which provided that the contractor could begin construction on portions of the project for which the government had approved the submittals while other portions of the design were still being reviewed (*id.* at 197). The scope of work specification also contained ¶ 3.8.5 "Commencement of Construction" which provided that commencement of construction prior to the notice to proceed would "be at the Contractor's own risk and expense" (*id.* at 197).

9. The DD Form 1155 awarding Task Order No. 9 to Pro-Built provided for the base bid proposal line items that, "THIS DOES NOT CONSTITUTE YOUR NOTICE TO PROCEED" (R4, tab 17 at 6). The same warning was included for the optional bid line items (*id.* at 7).

10. The Notice of Award letter advised Pro-Built that it was required to account for "<u>all</u> contractor personnel, to include subcontractors and vendors, performing services under this contract in the U.S. [Central Command] Area of Responsibility" in the Synchronized Pre-deployment Operational Tracker (SPOT) (R4, tab 16 at 1). The letter provided that SPOT registration demanded Pro-Built's "immediate attention in advance of the preconstruction conference" and additionally required Pro-Built to "enter 'all' your personnel under this contract within ten (10) calendar days from the date of this letter" (R4, tab 16 at 1-2).

11. Mr. Ismail Amiri, managing consultant and acting chief executive officer for Pro-Built testified that he was familiar with the SPOT system and that the contract required Pro-Built to identify its employees within ten days (tr. 1/66-67). However, Mr. Amiri testified that usually after receiving an award Pro-Built would enter three or four names into the SPOT system and that this was acceptable to the contracting officer (tr. 1/67). Mr. Amiri was unable to recall if any employees were entered into the SPOT system for task order 9 (tr. 1/67-68).

12. Mr. Amiri described the site conditions in Zabul Province, Afghanistan as dangerous, the center of activities of the insurgents and a "very non-secure area" (tr. 1/20-21). He further testified that it was difficult to find qualified subcontractors and laborers in 2011 because of booming construction in Afghanistan and because of security issues. Mr. Amiri testified that qualified subcontractors and qualified staff would prefer to work in other areas of Afghanistan where it was more secure and there were projects available. (Tr. 1/23) Mr. Amiri testified that, due to the labor market conditions, Pro-Built assembled a team of workers before the notice to proceed because, "[i]f you do not have a dedicated team concentrating on the project from the start, you will never be able to finish it" (tr. 1/49). Mr. Amiri also testified that he anticipated receiving the notice to proceed one month after the contract award (tr. 1/25).

4

13. Mr. Amiri noted that the number of employees retained at the start of a project varied depending on the complexity of the project and location (tr. 1/92-93). Mr. Amiri additionally testified that "the construction never started" and that "if you would start the construction we would hire maybe 150 to 200 more, you know, laborers, you know. We did not hire them." (Tr. 1/69, 81) Mr. Amiri testified that the timekeeper was responsible for keeping track of equipment use and not employee hours (tr. 1/80-81). Additionally, Mr. Amiri testified that, the security manager was responsible for performing security analysis and to consider threats to Pro-Built's staff, but was not the person actually carrying a rifle (tr. 1/86-87).

14. Mr. Amiri testified that the normal employment practice in Afghanistan is to hire workers on a monthly basis, with a minimum contract of one month, and requiring a minimum of one month notice before terminating an employee (tr. 1/34).

15. While waiting for the notice to proceed, Pro-Built prepared its pre-construction submittal, quality control plan, accident prevention plan, and security plan. It also sent staff and subcontractors to see the site, talk with the local people and talk with the village elders, and considered elements for the design including building codes and specifications. (Tr. 1/26-27)

16. In an email dated 24 October 2011, the government's project engineer, Mr. Ron Rodriguez informed Pro-Built that the pre-construction meeting would take place on 29 October 2011. He indicated that only Pro-Built's major subcontractors needed to attend the meeting, and informed Pro-Built that he anticipated issuing the notice to proceed after the meeting. (App. supp. R4, tab A-2)

17. On 29 October 2011, Pro-Built attended the pre-construction meeting that, among other things, identified the government personnel for the project, explained their roles and responsibilities, and provided their contact information (R4, tab 22 at 8-13, 53).

18. On 12 November 2011, Pro-Built emailed Mr. Rodriguez requesting a meeting regarding progress of the project. Mr. Rodriquez responded the same day: "[u]nfortunately we have not been given direction from the Area Office on the way forward for the [district headquarters]. We cannot schedule a mutual understanding meeting at this time. I will notify you as soon as the Project Office receives a directive from the Area Engineer and Project Manager." (App. supp. R4, tab A-3)

19. On 18 December 2011, Pro-Built emailed Mr. Rodriguez, writing that it had been more than a month since Pro-Built had submitted its pre-construction submittals. Pro-Built referred to the 14-day response time provided for in the request

for proposal, and stated it was looking ahead to receive the notice to proceed. (App. supp. R4, tab A-5)

20. On 19 December 2011, Mr. Rodriguez responded to the 18 December email, stating that "[t]he Area Office is working on a possible reduction in the scope of work. I will keep you informed of anticipated notice to proceed issue date." (App. supp. R4, tab A-5)

II.    Termination For Convenience

21. On 15 January 2012, the NATO Training Mission—Afghanistan, Combined Security Transition Command—Afghanistan, Afghanistan National Police Infrastructure Branch Chief asked the Corps to terminate task order 9 for convenience of the government due to "negative security conditions" (R4, tab 23).

22. On 4 March 2012, the Corps' contracting officer issued Serial Letter No. C-0003 to Pro-Built, terminating task order 9 for the convenience of the government pursuant to FAR 52.249-2 (R4, tab 25).

III.    Pro-Built's Termination For Convenience Claim

23. On 8 March 2012, four days after the termination for convenience, Pro-Built submitted a termination for convenience settlement proposal[1] (R4, tab 1 at 5). On 1 April 2012, the Corps informed Pro-Built that its settlement proposal was inadequate (R4, tab 26). Pro-Built subsequently submitted a revised proposal dated 28 February 2013, in the amount of $1,133,243. By letter dated 11 March 2013, the Corps informed Pro-Built that its revised settlement proposal was deficient. (R4, tab 30) Pro-Built issued a third settlement proposal in the amount of $1,115,418 on 25 March 2013, which the Corps again determined to be deficient (R4, tab 2).

24. On 5 September 2013, DCAA issued Audit Report No. 2241-2013A17100007 concerning Pro-Built's 25 March 2013 termination for convenience settlement proposal (R4, tab 32).

25. The DCAA audit report questioned the entire $1,115,418 proposed by Pro-Built as unallowable pursuant to FAR 31.201-2, Determining allowability, because Pro-Built did not comply with the FAR 52-211-10, Commencement, Prosecution, and Completion of Work clause when it incurred costs, prior to receiving the notice to proceed (R4, tab 32 at 7-8).

---

[1] Pro-Built's 8 March 2012 settlement proposal is not included in the record.

6

26. The DCAA audit report also concluded that it was "unreasonable" for Pro-Built to have incurred any costs, other than to meet bond, insurance, or administrative requirements, prior to receiving the notice to proceed; that Pro-Built did not have a formal accounting system; that Pro-Built's proposal was not an acceptable basis for settlement; and that Pro-Built had not properly calculated its General and Administrative (G&A) costs (R4, tab 32 at 4-8).

27. The DCAA audit also questioned Pro-Built's direct labor and subcontractor costs as unreasonable, in part because Pro-Built failed to submit subcontractor settlements to the contracting officer for ratification (R4, tab 32 at 9). The audit noted that Pro-Built's direct labor costs were based on pay slips and employment agreements, and that the signed pay slips included the project name among other information. DCAA did not question the direct labor costs for lack of supporting documentation. *Id.* In addition, the DCAA audit questioned Pro-Built's claimed profit as unallowable anticipatory profit (*id.*).

28. By letter dated 30 January 2014, the contracting officer offered to settle the termination for convenience claim, recognizing Pro-Built's costs "properly incurred and supported in meeting bond, insurance and other administrative requirements" (R4, tab 33). Pro-Built rejected the Corps' offer (R4, tab 2 at 2).

29. By letter dated 27 February 2014, the contracting officer increased his settlement offer to $48,972, and provided that the offer would expire on 17 March 2014 (R4, tab 34). Pro-Built did not accept the offer by the 17 March 2014 deadline (R4, tab 2 at 2).

30. On 31 March 2014 Pro-Built submitted a certified claim seeking $1,115,418 in settlement costs, and provided certain supporting documentation (R4, tab 35).

31. On 4 April 2014, the contracting officer issued a settlement by determination[2] in the amount of $48,972, pursuant to FAR 49.109-7(d) (R4, tab 2).

32. On 9 April 2014, the contracting officer issued Modification No. 02 to task order 9, definitizing the settlement by determination of $48,972 (R4, tab 19).

---

[2] A settlement by determination is a unilateral decision by the contracting officer establishing a termination settlement amount when the parties are unable to come to a mutual agreement. This determination is a contracting officer's decision, subject to the contract's disputes clause. FAR 49.109-7(d).

33. On 23 April 2014 the Corps responded to Pro-Built's 31 March 2014 certified claim informing Pro-Built that the 4 April 2014 settlement determination was the final decision of the contracting officer (R4, tab 36).

IV. Litigation Before the Board

34. Pro-Built timely appealed to the Board on 28 April 2014 (R4, tab 1).

35. Pro-Built subsequently proffered to the Board an expert report by James L. McGovern, Certified Public Accountant/Certified in Financial Forensics, Certified Valuation Analyst dated 25 June 2015 (app. supp. R4, tab A-9). Mr. McGovern reviewed documentation, including staff salary slips, for the project and communicated with Mr. Ismail Amiri and a second Pro-Built employee, Mr. Farzad Farzam (app. supp. R4, tab A-9 at 38; tr. 1/102-03). At the hearing in June 2016, Mr. McGovern was admitted as an expert in government contract cost accounting (tr. 1/104).

36. The expert report indicated that Pro-Built had a rudimentary accounting system built on Excel spreadsheets similar to systems used by other small, unsophisticated contractors. Pro-Built's practice was to track each project's costs using spreadsheets for labor, materials, subcontractors, and equipment utilized on each project. The accounting for each project would then be rolled up into formal financial statements for the company. (App. supp. R4, tab A-9 at 32-33) Because the contract did not specify the use of any particular accounting system, Mr. McGovern opined that it was unreasonable for the DCAA audit to have expected Pro-Built to have "conducted business and maintained records according to standards not commonly practiced by small Afghani companies" (app. supp. R4, tab A-9 at 33).

37. Formal financial statements for Pro-Built were prepared and audited by Akram and Company, a chartered accounting firm in Afghanistan (app. supp. R4, tab A-9 at 33, 372-409). The audited financial statements were initiated at the suggestion of Mr. McGovern and are dated May and June 2014, after the commencement of this litigation (app. supp. R4, tab A-9, ex. D; tr. 1/113).

38. In his expert report, Mr. McGovern stated that the common practice in Afghanistan, followed by Pro-Built, was to hire project personnel by employment contracts specific to each project and to pay them monthly salaries without requiring detailed time sheets. Similarly, subcontracts did not require formal documentation of each dollar spent. (App. supp. R4, tab A-9 at 34) Mr. McGovern also provided his expert opinion, based upon his work with other contractors in Afghanistan, that assembling a dedicated project team for each project was common practice in Afghanistan (id. at 36).

8

39. Mr. McGovern concluded that Pro-Built was entitled to $816,273 under the contract (app. supp. R4, tab A-9 at 50). Mr. McGovern attached a revised settlement proposal form SF 1436 to his expert report, detailing the $816,273 amount (*id.* at 52-55).

40. The settlement proposal includes direct labor of $416,715.83. Exhibit A to the expert report breaks out the claimed categories of direct field labor and the monthly salaries for these positions. The categories as set forth in the proposal are:

| | |
|---|---|
| • driver | $500 |
| • security manager | $3,000 |
| • surveyor | $2,500 |
| • logistic officer | $2,000 |
| • mechanical engineer | $5,500 |
| • procurement officer | $1,200 |
| • survey helper | $1,000 |
| • electrical engineer | $5,000 |
| • safety officer | $1,200 |
| • cook | $500 |
| • construction manager | $4,500 |
| • civil engineer | $5,000 |
| • qc manager | $4,500 |
| • project scheduler | $5,000 |
| • safety officer | $2,500 |
| • admin manager | $2,300 |
| • project manager | $9,000 |
| • project doctor | $1,800 |
| • site engineer | $3,000 |
| • time keeper | $1,200 |

(App. supp. R4, tab A-9 at 57)

41. Mr. McGovern reduced Pro-Built's $741,394 direct labor claim in the earlier settlement proposal to eliminate the costs of employees who he determined could work on other projects and to move subcontractor costs to a separate category (app. supp. R4, tab A-9 at 38). Notwithstanding these reductions, there remain a number of questionable employee costs in Mr. McGovern's report as set forth immediately, below.

42. Pro-Built's settlement proposal claims the salary of Mr. Javed Shahab as quality control manager from August 2011 through March 2012; however, on 9 October 2011, Pro-Built submitted its quality control plan, listing other individuals

9

as the quality control manager and alternate quality control manager (app. supp. R4, tab A-9, ex. A; R4, tab 21 at 25-33; tr. 1/75-76).

43. Pro-Built's settlement proposal claims the salary of Mr. Habib Rahman as construction manager for the project from August 2011 through October 2011; however, on 9 October 2011, Pro-Built submitted its quality control plan, listing Rohullah Nazari as construction manager (app. supp. R4, tab A-9, ex. A; R4, tab 21 at 34).

44. Pro-Built's settlement proposal claims the salary of Mr. Wahab Gul as timekeeper from August 2011 through March 2012; however no records were kept of Pro-Built employees' time working under the contract (app. supp. R4, tab A-9, ex. A; tr. 1/79-81). Mr. Amiri testified that Mr. Gul's job as timekeeper involved tracking the hourly operation of machinery at the job site (tr. 1/33). However, there was no machinery on the job site because the notice to proceed was not issued (tr. 1/80-81).

45. Pro-Built's settlement proposal claims the salary of Mr. Khalid Haqjo as project scheduler from August 2011 through October 2011; however, Mr. Haqjo was a Pro-Built employee prior to the award of the contract and had supervisory responsibilities on other task orders during the performance of the contract (app. supp. R4, tab A-9 at 57; tr. 1/50, 60-62; exs. DE1, DE2).

46. Pro-Built's settlement proposal claims 70 percent of the salaries of Mr. Bashir Mashal as mechanical engineer and Mr. Haron Jalalzada as civil engineer, from August 2011 through March 2012, with the other 30 percent of their time devoted to two other contracts; however, Mr. Mashal was a Pro-Built employee prior to the award of the contract and worked on all of Pro-Built's projects (app. supp. R4, tab A-9 at 57; tr. 1/50, 64-65).

47. Pro-Built's settlement proposal claims the salary of Mr. Fayaq Ahmad as electrical engineer from August 2011 through March 2012; however, Mr. Ahmad was a Pro-Built employee prior to the award of the contract and worked on all of Pro-Built's projects (app. supp. R4, tab A-9 at 57; tr. 1/52, 64-65).

48. Pro-Built's settlement proposal claims the salary of Mr. Mohammad Asif as safety officer from August 2011 through March 2012; however, Mr. Asif was a Pro-Built employee prior to the award of the contract (app. supp. R4, tab A-9 at 57; tr. 1/65).

49. Pro-Built's settlement proposal also included costs for its security subcontractor, Arya Security Company (Arya) in the amount of $40,800 for three armed security guards at $5,100 per month, for eight months from August 2011

through March 2012; and costs for its construction subcontractor, Najah Tallat Construction & Road Building Company (NTCC), in the amount of $200,000 representing eight employees at a total cost of $25,000 per month for eight months. The claimed amount for NTCC represents almost 7% of the subcontract's agreed upon fixed price of $2,869,700. (App. supp. R4, tab A-9 at 40, 41, 257-365)

50. The subcontract between Pro-Built and NTCC was originally executed in their native language. The copy of the subcontract in the record is a translation for purposes of obtaining a customs clearance. (Tr. 1/85-86) The subcontract provides, in a prefatory "Background Information" section, that Pro-Built "intends" to hire NTCC (app. supp. R4, tab A-9 at 267). In addition, paragraph 1.3 provides that:

> The following shall be a condition precedent to this Agreement: The project consists of the Design and Construction of UP District Headquarter in Atghar, Zabul, Afghanistan, based on designs, drawings, scope of work and technical requirements and specifications provided by the Contractor and approved by Client. This Work is defined as the management, material, labor, and equipment to construct the facilities and related structures in accordance with the Scope of Work, the Technical Requirements/specifications, commercial terms, construction procedures, quality & safety norms & client's requirements – modifications- suggestions, objections, all back to back applicable as far as the facilities being constructed by the sub-contractor. Part of the work is provision of Spare parts as required by the Client for all systems described above.

(App. supp. R4, tab A-9 at 268)

51. The settlement proposal also includes Defense Base Act (DBA) insurance fees of $17,020, including transfer costs (app. supp. R4, tab A-9 at 41, 367-69).

52. Mr. McGovern recalculated the G&A expense by dividing G&A expense by total direct cost of all contracts, resulting in a rate of 8.7% and a claimed amount of $58,533 (app. supp. R4, tab A-9 at 42, 371-409).

53. The settlement proposal additionally applies a 10% profit rate (app. supp. R4, tab A-9 at 42). Mr. McGovern testified that a 10% profit rate was "pretty common" given the nature of the work, the difficulty of the type of work and the fact

11

that it was being performed in a war zone where there were "significant security issues" (tr. 1/118-19).

54. Finally, the settlement proposal asserts entitlement to settlement expenses of $3,777 in legal and accounting fees, and $6,098 in in-house labor for the finance manager and administrator time (app. supp. R4, tab A-9 at 54).

## DECISION

The resolution of this appeal turns upon the reasonableness of the costs incurred by Pro-Built in preparation to perform the contract. Pro-Built argues that it was necessary to staff portions of the contract before bidding to ensure that it would be possible to obtain the necessary people if awarded the contract. Pro-Built cites to Afghani business practices and labor market conditions, along with the security situation in the Zabul province of Afghanistan as reasons for this approach. Pro-Built also asserts that the claimed costs were permissible as the costs were incurred in preparing to perform the contract and were not construction costs that would have been incurred at Pro-Built's risk prior to a notice to proceed. (App. br. at 9-10)

Conversely, the Corps alleges that it was unreasonable for Pro-Built to incur costs prior to the notice to proceed. The Corps asserts that it was especially unreasonable for Pro-Built to incur such costs on this contract because it was a design-build contract where Pro-Built would not be able to begin construction until design submittals were prepared and approved by the Corps, a process that would take several months (gov't br. at 16-18). Additionally, the Corps cites to multiple deficiencies in Pro-Built's termination for convenience claim, including Pro-Built's failure to enter most or all of the workers for which it seeks reimbursement into the SPOT system; the fact that the quality control submittal lists individuals other than those included in the termination for convenience claim in certain key roles; the fact that individuals identified as working full-time on the contract appear to have done work on other Pro-Built projects; and the fact that a number of the identified individuals were Pro-Built employees prior to award of the contract (*id.* at 23-26).

The Corps terminated Pro-Built's task order for the convenience of the government. The termination for convenience of a fixed-price contract "has the general effect of" converting the contract into a cost-reimbursement contract. *See, e.g., New York Shipbuilding Co., A Division of Merritt-Chapman & Scott Corp.,* ASBCA No. 15443, 73-1 BCA ¶ 9852 at 46,019. The terminated contract thus

12

provides for reimbursement of allowable costs incurred in performing the terminated portion of the contract. *Id.*

Here, the contract provided that no construction work was to be performed prior to the notice to proceed (findings 7-8 ("Any work performed by the Contractor prior to receipt of the clearance for construction, shall be at the Contractor's own risk and expense.")). As the notice to proceed was not issued, construction costs are not reimbursable. However, costs incurred in preparing to perform are reimbursable. FAR 49.201(a) ("A settlement should compensate the contractor fairly for the work done and the preparations made for the terminated portions of the contract..."). The FAR provides that "[f]air compensation is a matter of judgment and cannot be measured exactly.... The use of business judgment, as distinguished from strict accounting principles, is the heart of a settlement." FAR 49.201(a). Additionally, the FAR provides that "[c]ost and accounting data may provide guides, but are not rigid measures, for ascertaining fair compensation." FAR 49.201(c).

Under the proper circumstances, standby labor costs are reimbursable. *See Bennie J. Meeks t/a Lawn Grooming Service*, GSBCA No. 6605-REM, 85-2 BCA ¶ 17,947. In *Meeks*, the General Services Board of Contract Appeals initially denied the contractor recovery for most of its expenses in preparing to perform. *See Bennie J. Meeks t/a Lawn Grooming Service*, GSBCA No. 6605, 84-1 BCA ¶ 16,937, *rev'd* 758 F.2d 661 (Fed. Cir. 1984). The United States Court of Appeals for the Federal Circuit reversed in an unpublished opinion. *Meeks v. United States*, 758 F.2d 661 (Fed. Cir. 1984) (table). On remand, in accordance with the Federal Circuit's direction to revisit its out of hand rejection of pre-performance costs the General Services Board held that the contractor "reasonably concluded that he must begin preparing to perform the contract shortly after he knew he would be committed to it" and that, the "costs he incurred in hiring, training, and keeping a group of workmen on a standby basis were legitimately a part of his gearing-up effort, and he would not have incurred them except in anticipation of performing the subject contract." *Meeks*, 85-2 BCA ¶ 17,947 at 89,921, 89,923.

In this appeal, Pro-Built provided the uncontroverted testimony of Mr. Amiri and its expert witness, Mr. McGovern, that workers in Afghanistan are normally employed through contracts on a monthly basis, with a minimum term of one month, and requiring one month's notice before termination (findings 14, 38). Accordingly, we analyze the termination for convenience proposal on that basis. In addition, Pro-Built presented the unrefuted testimony of Mr. Amiri and Mr. McGovern's expert opinion that it was necessary to retain key employees in advance of bidding for a construction project due to the construction labor market and security situation, in order to ensure the ability to complete the project. (Findings 12, 38) The Federal Circuit has noted that the "standard for assessing reasonableness is flexible, allowing [the Board] to consider many fact-intensive and context-specific factors." *Kellogg,*

*Brown & Root Services,* 728 F.3d 1348, 1360 (Fed. Cir. 2013) (citing FAR 31.201-3). Accordingly, we find that Pro-Built incurred costs in preparing to perform and that these costs took the form of monthly employment contracts.

Had the Corps issued the notice to proceed, Pro-Built would have been required to build the police station, and, because it was a firm-fixed-price contract, Pro-Built would not have been entitled to an adjustment for standby labor costs incurred prior to the notice to proceed. Thus, Pro-Built exercised its business judgment and determined that it was in the firm's best interest to retain these individuals in advance of the notice to proceed. Here, the Corps is simply second guessing the business decisions made by Pro-Built.

Having determined that Pro-Built incurred costs in preparing to perform and that these costs took the form of monthly employment contracts, we turn to the reasonableness of the amounts claimed. The Corps does not allege that the monthly wages for specific employees are unreasonable, so we allow them. The Corps questioned the employment of a timekeeper since no timesheets were kept for the workers as they were paid monthly salaries. Mr. Amiri testified that the timekeeper would be responsible for keeping track of equipment use once construction began (finding 13). The Corps questioned the employment of security personnel because the subcontract with NTCC also required the construction subcontractor to provide security (gov't br. at 25). Mr. Amiri testified that the security manager was responsible for performing security analysis and considering threats to Pro-Built's staff, but was not the person actually carrying a rifle (finding 13). Mr. Amiri also noted that the number of employees retained at the start of a project varied depending on the location and complexity of the project (*id.*). We credit Mr. Amiri's testimony and hold that it was reasonable for Pro-Built to retain the twenty listed employees in preparation to perform the contract.

Having determined that Pro-Built reasonably retained these individuals using monthly employment contracts, the question is whether it was reasonable to retain these individuals for the entire eight-month period from August 2011 through March 2012. We note that two employees, the construction manager and project scheduler, were reassigned to other task orders after three months (findings 43, 45). Additionally, Pro-Built allocated 30% of the time for the mechanical engineer and civil engineer to other projects (finding 46). For the remaining sixteen employees, Pro-Built includes in the settlement proposal 100% of their monthly wages for eight months. We do not find these costs to be reasonable.

Pro-Built is experienced in government contracting, and was performing other task orders for the Corps on the same MATOC (finding 1). While it may have been reasonable to line-up the key employees in preparation to perform the contract, it was not reasonable to continue paying them for eight months without any work being

14

performed. Simply put, it strains credulity to assume that a contractor would pay individuals for no work for eight months. Here, the record demonstrates that Pro-Built moved some individuals to other task orders after three months and had other employees split their time with other task orders through the duration of the contract. (Findings 43, 45-46) Moreover, the government demonstrated that some of the employees performed work on other task orders (findings 45-47). Additionally, we note that a number of the workers were existing Pro-Built employees prior to award of the current task order (findings 45-48). Pro-Built, the party with the burden of proof, does not explain why these workers could not have been moved to other task orders during this period. Moreover, Mr. Amiri's testimony that each of the employees worked 100% on the contract is contradicted by the Corps' demonstration that some of the workers did work on other projects, and the fact that Pro-Built's pre-construction submittals identify individuals other than those identified in the settlement proposal, as responsible for certain key tasks. (Findings 42-48)

Pro-Built alleges that it was reasonable to keep the employees included in the settlement proposal on payroll based upon the Corps' continued representations that the notice to proceed would be issued shortly (app. supp. br. at 10). However, the record does not support such a conclusion. As an initial point, we note that Mr. Amiri testified that he expected to receive the notice to proceed one month after being awarded the contract (finding 12). The pre-construction conference was not held until 29 October, some three months after contract award (finding 17). Despite statements that the notice to proceed would be issued after the pre-construction conference, two weeks after that conference the Corps told Pro-Built that it had "not been given direction from the Area Office on the way forward for the [district headquarters]" and that it could not schedule further meetings (finding 18). In December, the Corps informed Pro-Built that the Area Office was considering a reduction in scope of the project (finding 20). Pro-Built was performing a fixed-price contract and a reasonable contractor, even in Afghanistan, would separate workers or shift workers to other task orders rather than paying workers to standby for eight months.

Pro-Built cites to the 365-day performance period as an aggressive schedule requiring it to be staffed-up and ready to begin construction as soon at the notice to proceed was issued (app. br. at 9). However, as the Corps notes (gov't br. at 21), the liquidated damages pursuant to the contract were $1,579 per day, but Pro-Built's payroll for standby labor was $1,680 per day for its own direct labor[3] (findings 6, 40).

---

[3] The Corps' calculation here is actually conservative in that it does not consider the per day cost of subcontractor labor. Adding the claimed subcontractor labor would add roughly $1,000 per day to the standby costs. (App. supp. R4, tab A-9 at 53)

15

Thus, financially, Pro-Built would have been better-off risking the liquidated damages rather than paying for standby labor.

The Corps also alleges that Pro-Built "had outstanding submittals that were required for [the notice to proceed] for several months after contract award" and that this is evidence that Pro-Built failed to demonstrate that its staffing was reasonable or that the claimed expenses were allocable to the project (gov't reply br. at 2).[4] However, the Corps' argument finds no support in the record as the security and quality control submittals were not required prior to the notice to proceed. The contract required approval of a security plan before the contractor could start work on the project site, but it was not explicitly a prerequisite to receiving the notice to proceed (finding 2). In addition, the submission of a quality control plan was required not later than five days *after* the notice to proceed (*id.*). Regardless, Pro-Built did submit these plans, and the Corps did not timely review the submissions (finding 19).

The Corps additionally asserts that "Pro-Built has not met its burden to show that these alleged employees were paid" based upon asserted "credibility problems" with Mr. Amiri's testimony (gov't reply br. at 6). However, even ignoring Mr. Amiri's testimony, Mr. McGovern's expert report indicated that he reviewed the staff salary documentation (finding 35) and the salary records and employment agreements (which we have reviewed and are extensive) that were included in Mr. McGovern's expert report (app. supp. R4, tab A-9 at 58-255).[5]

The Board's task of determining the reasonableness of the costs incurred is complicated by the parties' all-or-nothing litigation strategies. Pro-Built asserts that all eight months of costs were reasonable and the Corps asserts that none of the costs were reasonable. As neither party proposed a basis for determining a reasonable period for Pro-Built to keep workers under contract, it is up to the Board to determine a reasonable amount. Given the totality of the evidence, we conclude that a reasonable contractor in Afghanistan would have reassigned workers to other contracts, or separated the employees, not later than three months after award. In fact, Pro-Built moved two of its workers to other projects at this time (findings 43, 45), demonstrating that Pro-Built was concerned with incurring salary costs without any construction work being performed. Given that Mr. Amiri expected to receive the notice to proceed one month after award, this provides for two additional months of standby labor, which we find to be reasonable based on the facts of this appeal. We have considered the evidence that some workers performed work on other task orders but are charged

_____

[4] The Corps' reply brief does not have page numbers.

[5] Moreover, we note that DCAA reviewed the salary records and employment agreements and did not question the costs on the basis that they had not been paid (finding 27).

16

100% to this contract, and that the names of the workers in the settlement proposal do not match the names of individuals included in Pro-Built's contractual submissions (findings 42-48), but this does not change our conclusion. Thus, we find that Pro-Built is entitled to $173,965.83[6] for its direct labor from August 2011 through October 2011. (App. supp. R4, tab A-9 at 57)

Having determined that Pro-Built is entitled to three months of pay for its direct employees, we turn to Pro-Built's subcontractor costs. Pro-Built claims $40,800 in subcontractor direct labor for its security subcontractor, Arya, and $200,000 for direct subcontractor labor for its construction subcontractor, NTCC. Pro-Built asserts that it was necessary to assemble a dedicated team at the start of the contract to ensure their availability and that the settlement proposal includes only direct labor retained by the subcontractor. (App. br. at 4, 10) As with its challenges to Pro-Built's direct labor, the Corps again asserts that it was unreasonable for Pro-Built to retain subcontractors before the notice to proceed (gov't br. at 24). The Corps additionally challenges the costs because the language of the subcontract with NTCC purportedly indicated only that the parties intended to enter into a contract, and because Pro-Built's provision of approved plans to NTCC was a condition precedent to the contract, and that provision was not met (gov't br. at 25-26).

We agree with Pro-Built that the language contained in the NTCC subcontract providing that Pro-Built "intends" to hire NTCC (finding 50) is simply a prefatory comment providing the reason for the formal agreement that follows (app. reply at 5). The Corps' argument that the subcontract was not effective because the condition precedent of delivery of drawings was not met fares no better. Mr. Amiri testified that Pro-Built initially entered into an agreement with NTCC in their native language. The subcontract in the record is a translation of the agreement into English for the purpose of obtaining a customs clearance. (Finding 50) While the subcontract contains the term "condition precedent" it does not appear that the term is being used in the legal sense. The translated clause, read as a whole, requires NTCC to build the entire headquarters based on whatever design is ultimately submitted by Pro-Built and approved by the Corps. (Id.) We do not read the language of the clause as setting forth a legal condition precedent, that is, an act or event that must occur before a duty to perform arises.

As with Pro-Built's direct labor, we find that a reasonable contractor would have terminated or renegotiated subcontracts after three months. Here, Arya was paid

---

[6] This amount is based on Pro-Built's payroll records and is slightly lower than three times the monthly salaries in finding 40 because the monthly salaries for two employees were partially allocated to other contracts (finding 46) and due to some minor payroll differences in certain months.

$15,300 for the first three months of security (app. supp. R4, tab A-9 at 257). NTCC billed $25,000 per month, which would total $75,000 for the first three months. This results in a total subcontract cost of $90,300.

The Corps does not dispute, and has already paid Pro-Built for its DBA insurance cost of $17,020. Pro-Built additionally claims overhead, profit and its costs in preparing the settlement proposal.

Pro-Built asserts entitlement to 8.7% of its direct costs for G&A expenses. The Corps' post-hearing brief includes a proposed fact noting that Mr. McGovern calculated the G&A expense rate using financial reports that were prepared for the purposes of litigation, but does not include any argument on this point (gov't br. at 50). As the contract did not require Pro-Built to maintain such records, and because the Corps does not present any argument that the calculations are incorrect, we find that Pro-Built is entitled to 8.7% of G&A expenses. Similarly, the Corps does not challenge the use of a 10% rate of profit on the contract, and we find the proposed rate to be reasonable. However, we note that FAR 49.202(c)(3) prohibits profit on settlements with construction subcontractors for "preparations made to complete the work." As the notice to proceed was not issued, we find that Pro-Built is not entitled to profit on NTCC's subcontract costs. *See Singleton Enterprises v. Dept. of Homeland Security*, CBCA No. 2771, 12-2 BCA ¶ 35,139 at 172,508. Accordingly, Pro-Built is entitled to $24,471.87 in G&A expense and $23,075.77 in profit. As a final point, the Corps argues that Pro-Built should not recover profit pursuant to the allowance for loss provision, FAR 49.203. The burden for demonstrating that Pro-Built would have lost money performing the contract falls on the Corps. *Systems & Computer Information, Inc.*, ASBCA No. 18458, 78-1 BCA ¶ 12,946 at 63,131. Here the Corps provides no analysis, other than a statement by counsel, in support of its theory that Pro-Built would have lost money performing the contract. Accordingly, we find that the Corps has not met its burden, and award profit to Pro-Built. Finally, the Corps does not challenge Pro-Built's claim for settlement costs of $9,875 for legal and accounting fees and in-house labor which we find to be reasonable. Thus summing Pro-Built's allowable direct labor, subcontract costs, DBA insurance, G&A and profit. Pro-Built is entitled to recover $338,708.47. After deducting the $48,972 already paid Pro-Built, it is entitled to recover $289,736.47.

18

## CONCLUSION

In addition to the amount already paid pursuant to the contracting officer's settlement by determination, we sustain Pro-Built's appeal in the amount of $289,736.47 with CDA interest to run from 31 March 2014, the date of Pro-Built's certified claim.

Dated: 1 June 2017

DAVID D'ALESSANDRIS
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59278, Appeal of Pro-Built Construction Firm, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

19